WILLIS M. EVERETT, III, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; NEAL M. ALLEN AND JOAN W. ALLEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Everett v. Commissioner
Docket Nos. 48539-86[1]
; 3375-87
United States Tax Court
T.C. Memo 1990-65; 1990 Tax Ct. Memo LEXIS 65; 58 T.C.M. (CCH) 1366; T.C.M. (RIA) 90065; February 12, 1990; As corrected February 14, 1990 Kevin N. Kemp, James P. O'Neill, and William O'C. Harnisch, for the petitioners. Elizabeth P. Flores and Vincent J. Guiliano, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: In these consolidated cases, the Commissioner determined the following deficiencies in petitioners' Federal income tax and additions to tax for the taxable years and in the amounts as follows: Additions to Tax Taxable
Sec.
Sec.
Petitioner(s)
Year
Deficiency
6653(a)(1) [2]
6653(a)(2)
Willis M. Everett, III
1981
$ 26,475.75
1,323.79    *
Neal M. Allen and
1981
23,833.76
1,191.69    *
Joan W. Allen [3]
1982
902.73
45.14    *
*68 The Commissioner also determined that petitioners are liable for increased interest under section 6621(c). The issues for our decision are: (1) Whether amounts expended by York Research Computer Partnership Limited Partnership in the taxable years 1981 and 1982 for research and development were "in connection with" a trade or business pursuant to section 174; (2) whether petitioners are liable for an addition to tax pursuant to section 6653(a)(1) and (2); and (3) whether petitioners are liable for increased interest pursuant to section 6621(c). FINDINGS OF FACT Some of the facts of this case have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by this reference. Petitioners resided in Georgia at the time they filed their petitions in this case. In 1981, Edward J. Grace (Grace), Bradford P. Hebert (Hebert), and Fred S. Schlaffer (Schlaffer) developed the concept of creating a desktop computer system but did not have the funds necessary to develop the concept. Schlaffer was therefore introduced to Robert M. Beningson (Beningson) because Beningson knew how to raise money for the development of this type of project. After *69 discussing ways of raising money to develop this concept, Beningson and Schlaffer concluded that the best way to fund the development of the desktop computer system was a research and development partnership. York Research Computer Partnership Limited Partnership (the Partnership) was formed on December 2, 1981, as a limited partnership under the laws of the State of Connecticut. Pursuant to the terms of the partnership agreement, the purposes for which the Partnership was organized included promoting and funding the design and development of a powerful desktop computer system for scientific, industrial, and other uses. Under the terms of the private offering memorandum, up to 50 units of limited partnership interests in the Partnership were offered for sale. Each unit cost $ 100,000, payable as follows: $ 20,000 in cash or certified check upon subscription; $ 10,000 on or before May 15, 1982; and $ 70,000 on or before January 15, 1986 (to the extent not previously paid by the Partnership out of Partnership revenues). The Partnership Agreement did not require the limited partners to make additional contributions other than those set forth above. Thirty-seven units of limited *70 partnership interests were sold to investors. On December 3, 1981, petitioner Willis M. Everett, III (Everett), and petitioner Neal M. Allen (Allen) each purchased one-half of a unit. Prior to purchasing their respective one-half units, petitioners consulted friends versed in computers and technology and also consulted their tax advisors regarding the legal and tax aspects of the investment. Petitioners also investigated the investment using resources from the investment firm at which they were employed. Pursuant to the partnership agreement, Everett and Alan were obligated to pay in consideration for each of their one-half unit of limited partnership interests the following amounts: (a) $ 10,000 upon subscription on December 3, 1981; (b) $ 5,000 on or before May 15, 1982; and (c) $ 35,000 on or before January 15, 1986 (to the extent not previously paid by the Partnership out of Partnership revenues). Everett paid the $ 10,000 and $ 5,000 amounts on December 3, 1981, and May 12, 1982, respectively, and Alan paid the $ 10,000 and $ 5,000 amounts on December 3, 1981, and May 1, 1982. York Research Corporation (York) was incorporated under the laws of the State of Delaware on *71 July 22, 1959, to engage in and conduct the business of scientific research and industrial planning, including the design and construction of industrial products; to carry on investigations and experiments of all kinds; and to originate, develop, improve, record, and preserve any discoveries, inventions, processes, formulae, and improvements. On December 2, 1981, York became the sole general partner of the Partnership. York, as general partner of the Partnership, intended to sponsor a transaction that could fund the research and development of the computer product. While York, as an environmental consultant, had a history of working in research and development generally, as of December of 1981, York did not have a computer background nor did it have a manufacturing plant. As of December 31, 1981, York's stock was traded on the over-the-counter market and reported on the NASDAQ national market system. Of the 583,753 shares outstanding, 110,600 shares were owned directly by Beningson and indirectly by him through RRR Ventures, Ltd., his wholly owned corporation, for a total ownership of 18.9 percent. Beningson also served as a director of York and was elected president of York in *72 May of 1982. On December 19, 1981, York acquired for investment purposes 1,200,000 shares of the Class A common stock of RRR Computers, Inc. (RRR), in exchange for 125,000 shares of York stock. RRR was incorporated by Beningson, Grace, Hebert, and Schlaffer on December 1, 1981, under the laws of the Commonwealth of Massachusetts. RRR subsequently changed its name to Avatar Technologies, Inc. (Avatar). The purposes for which RRR was organized were to engage in researching, designing, developing, manufacturing, purchasing, importing, exporting, licensing, distributing, repairing, maintaining, and marketing computer hardware, software, and related products and services. As of December 1, 1981, RRR had 2,400,000 shares of Class B common stock outstanding and Beningson, Grace, Hebert, and Schlaffer each owned 600,000 shares of such stock representing 25 percent of the voting power of RRR. Beningson was a director and shareholder of RRR because he wanted to keep track of the Partnership's investment in the research and development project. On December 4, 1981, the Partnership purchased from Hebert and Schlaffer for $ 5,000 their right, title, and interest in and to all inventions, *73 trade secrets, improvements, developments, concepts, and discoveries conceived, developed, or reduced to practice which related to the computer system. In addition, on December 4, 1981, the Partnership and RRR entered into the following: (a) a Research and Development Agreement (R & D Agreement); (b) an Option and Non-Exclusive License Agreement; (c) an Option and Exclusive License Agreement; and (d) an Option and Purchase Agreement. Pursuant to the R & D Agreement, RRR agreed to use its best efforts to conduct such research and perform such engineering and development services as necessary for the development of a desktop computer system and to deliver to the Partnership at least one prototype of the computer system by June 30, 1983. The R & D Agreement contemplated that RRR would be manufacturing a computer system along with other technology. Pursuant to such Agreement, the Partnership was obligated to pay a research and development fee to RRR in the amount of $ 3,510,000, payable as follows: (a) $ 550,000 in cash upon execution of the R & D Agreement; (b) $ 370,000 by delivery of a promissory note of the Partnership entitled "Recourse Promissory Note" (the 1983 Recourse Note), *74 together with an assumption agreement from each limited partner of the Partnership under which each such limited partner assumed his proportionate share of the 1983 Recourse Note; and (c) $ 2,590,000 by delivery of a promissory note of the Partnership entitled "Recourse Promissory Note due January 15, 1986" (the 1986 Recourse Note), together with an assumption agreement from each limited partner of the Partnership under which each such limited partner assumed his proportionate share of the 1986 Recourse Note. On December 3, 1981, Everett and Allen executed assumption agreements whereby each assumed the obligation to pay his proportionate share of the 1983 and 1986 Recourse Notes. The Partnership paid the initial $ 550,000 via wire transfer on December 10, 1981. Payment of the 1986 Recourse Note was to be made on or before January 15, 1986. Payment of the 1983 Recourse Note was to be made as follows: (a) $ 74,000 in cash on or before June 15, 1982; (b) $ 74,000 in cash on or before July 15, 1982; (c) $ 74,000 in cash on or before August 15, 1982; (d) $ 74,000 in cash on or before September 15, 1982; (e) $ 74,000 in cash on or before delivery of the prototype of the desktop computer *75 system called for under the R & D Agreement, or on June 30, 1983, whichever occurred sooner. The purpose of the payments as set forth in the R & D Agreement was to provide RRR with adequate working capital and financial resources for the implementation of the research and development project. RRR did not intend to make a profit from its receipt of the research and development fee. RRR regarded the marketing and sale of the computer product as the means of making a profit. Pursuant to the Non-Exclusive Option, RRR had an option to acquire a non-exclusive license for the purpose of manufacturing, marketing, leasing, selling, or otherwise disposing of the desktop computer system and other products developed under the R & D Agreement. The Non-Exclusive Option was exercisable within 10 days after RRR delivered the prototype of the desktop computer to the Partnership and, if exercised, RRR would acquire a nonexclusive license for a period of 13 months. Royalties payable under the non-exclusive license, if the Non-Exclusive Option were exercised, would be 4 percent of gross revenues derived by RRR from the licensed technology from all sources during the license period. Under the Non-Exclusive *76 License Agreement, if the Partnership granted a license to a licensee other than RRR, RRR was entitled to the most favorable royalty rates. Pursuant to the Exclusive Option, RRR had an option, which could be exercised during the last 30 days of the term of the non-exclusive license, to acquire an exclusive world-wide license for the purpose of manufacturing, marketing, leasing, selling, or otherwise disposing of the desktop computer system and other products developed under the R & D Agreement. If the Exclusive Option were exercised, the exclusive license would be perpetual, but RRR's obligation to pay royalties would terminate upon expiration of the last to expire of the patents issued with respect to the technology developed under the R & D Agreement or, if no patents were issued, 17 years after RRR's delivery to the Partnership of the prototype computer system. Royalties payable by RRR if the Exclusive Option were exercised would be 10 percent of the first $ 60,000,000 of revenues derived by RRR from the licensed technology from all sources, 5 percent of the next $ 65,000,000 of revenues and 2 percent of revenues thereafter. Pursuant to the Option and Purchase Agreement, RRR *77 had an option to acquire the technology developed under the R & D Agreement during the same 30-day period during which the Exclusive Option could be exercised. If the Exclusive Option were exercised, RRR had a continuing option to purchase all right, title, and interest in the technology under the Option and Purchase Agreement. If the Option and Purchase Agreement were exercised, the purchase price for the technology would be the greater of $ 9,250,000 or four times the annualized royalties payable by RRR from all sources for the 6-month period preceding exercise. The Partnership paid $ 296,000 of the 1983 Recourse Note by September 2, 1982. Petitioners paid their proportionate share of the entire amount due on the 1983 Recourse Note as a contribution to the capital of the Partnership in the amounts of $ 5,000 each in May 1982. Pursuant to the R & D Agreement, the Partnership received monthly status reports from RRR regarding the research and development of the project. In addition, Beningson attended monthly meetings with representatives of RRR to discuss the status of the Partnership's investment and the progress of the research and development. During the taxable years *78 in issue, the Partnership paid legal fees, finders fees, fees for other services rendered, accounting fees, and portions of the Recourse Notes. The Partnership maintained its own bank account. On September 23, 1982, RRR delivered to the Partnership a prototype of the Avatar TC-1 and exercised its option to license the Avatar TC-1 from the Partnership on a non-exclusive basis pursuant to the terms of the Non-Exclusive Option. The Avatar TC-1 is a device that links a personal computer to a company's mainframe computer so that the personal computer would essentially have the capabilities of a mainframe. On June 21, 1983, in order to raise capital for its operations, RRR issued preferred stock to venture capital investors pursuant to a stock purchase agreement. At that time, the Partnership and RRR renegotiated the terms of the four agreements dated December 4, 1981. In general, the agreements were modified to amend certain terms relating to the licensing and purchase of the technology rights. In February 1985, Orange-Nassau acquired Avatar. At this time, the Partnership agreed to pay the remaining balance of the research and development fee and, in turn, Avatar would pay the *79 Partnership an amount of money in excess of this balance. The Partnership used the money it received from Avatar to pay off the 1983 Recourse Note and 1986 Recourse Note. The Partnership filed its Federal income tax returns for the taxable years 1981 and 1982 in which it reported losses of $ 3,606,961 and $ 16,437. Petitioner Willis M. Everett filed his Federal income tax return for the taxable year 1981 and claimed the amount of $ 46,313 as his allocable share of partnership loss with respect to his investment in the Partnership. Petitioners Neal M. Allen and Joan W. Allen filed their joint Federal income tax returns for the taxable years 1981 and 1982 in which they claimed the amounts of $ 46,313 and $ 211 as their share of partnership losses with respect to their investment in the Partnership. The Commissioner disallowed the losses reported on the returns filed by the Partnership for the taxable years 1981 and 1982 and determined a deficiency in petitioner Willis M. Everett, III's Federal income tax for the taxable year 1981 in the amount of $ 26,475.75. The Commissioner disallowed Everett's claimed deduction in the amount of $ 46,313 for his allocable share of partnership *80 loss with respect to his investment in the Partnership for the taxable year 1981. In addition, the Commissioner determined that Everett was liable for an addition to tax pursuant to section 6653(a)(1) and (2) for the taxable year 1981 and determined that the entire deficiency for the taxable year 1981 is a substantial understatement attributable to a tax motivated transaction pursuant to section 6621(c). The Commissioner determined deficiencies in petitioners Neal M. Allen and Joan W. Allen's Federal income taxes for the taxable years 1981 and 1982 in the amounts of $ 23,833.76 and $ 902.73. The Commissioner disallowed the Allen's claimed deductions in the amounts of $ 46,313 and $ 211 for their allocable share of partnership losses with respect to their investment in the Partnership for the taxable years 1981 and 1982. In addition, the Commissioner determined that the Allens were liable for an addition to tax for the taxable years 1981 and 1982 pursuant to section 6653(a)(1) and (2), and determined that the entire deficiencies for the taxable years 1981 and 1982 are substantial underpayments attributable to a tax motivated transaction pursuant to section 6621(c). OPINION *81 We must first address some preliminary matters before we discuss the issues in this case. At trial, in his Motions to Amend Answers, respondent attempted to raise as new grounds that: (1) The Partnership is not entitled to deduct the research and developmental expenditures under section 174 because it was not the true owner of any product resulting from the research; and (2) the limited partners are not "at risk" pursuant to section 465 for their proportionate share of the note in the amount of $ 2,590,000 executed by the Partnership and RRR. We denied the motions to amend, citing Commissioner v. Transport Mfg. & Equip. Co., 478 F.2d 731 (8th Cir. 1973), affg. 57 T.C. 469 (1971), and pointed out that: the statutory notices of deficiency gave no grounds whatever for the disallowance of these deductions. The only grounds were that they were incorporated in a notice of examination to the Partnership which is not attached to the statutory notices mailed to petitioners. Petitioners alleged in their petitions that they did not have copies of the report of examination of the Partnership. Respondent in his answers did not attach copies of the examination *82 of the Partnership or otherwise inform petitioners as to what the issues were. The Court finds as a fact that petitioners in these cases were not advised of these two grounds, or two theories until September 30, 1988 and October 3, 1988 and that time for advising petitioners of the grounds is untimely. In his brief, respondent withdrew these arguments. However, in his brief, respondent contends that the Partnership is not entitled to deductions for miscellaneous expenses claimed for the taxable years 1981 and 1982. Respondent argues that these expenses were not currently deductible by the Partnership, or were not deductible at all, pursuant to sections 162, 183, 263, 709(a), 709(b), 212, and 195. Respondent contends that the pass-through of these miscellaneous deductions was denied in the statutory notices of deficiency mailed to each petitioner. Petitioners contend in their reply brief that these issues were not raised until after the trial and cannot now be considered by the Court without substantial prejudice to petitioners. Upon review of the statutory notices of deficiency mailed to each petitioner, we are unable to find these adjustments nor can we find any explanation *83 with respect to these adjustments. Petitioners were never provided with a copy of the explanation of partnership adjustments nor was one appended to the statutory notices of deficiency. In addition, respondent did not make reference to these new theories in his Answers, his trial memorandum, or at trial. As a result, and for the reasons stated at trial with respect to the motions to amend answers, we will not consider issues first raised in respondent's opening brief. Commissioner v. Transport Mfg. & Equip. Co., 478 F.2d at 736; Seligman v. Commissioner, 84 T.C. 191, 198 (1985), affd. 796 F.2d 116 (5th Cir. 1986). Turning to the first issue in this case, we must decide whether amounts expended by the Partnership in the taxable years 1981 and 1982 for research and development were "in connection with" a trade or business pursuant to section 174. Section 174(a)(1) provides that "A taxpayer may treat research and experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business *84 as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction." The provisions of section 174(a)(1) "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor)." Sec. 1.174-2(a)(2), Income Tax Regs.
In interpreting the phrase "in connection with * * * [a taxpayer's] trade or business" contained in section 174(a)(1), the Supreme Court, in Snow v. Commissioner, 416 U.S. 500 (1974), decided that the taxpayer need not currently be producing or selling any product in order to obtain a deduction for research expenses. The Court, however, did not eliminate the trade or business requirement for, as we decided in Green v. Commissioner, 83 T.C. 667, 686-687 (1984), *85 the taxpayer must still be engaged in a trade or business "at some time." Thus, we must decide through an examination of the facts of each case, whether the Partnership was engaged, at any time, in a trade or business in connection with which funds were expended for research and experimentation. Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987); Green v. Commissioner, supra.
Respondent contends that the Partnership never intended to engage in, and never in fact engaged in, a trade or business and that it would never be financially capable of entering a trade or business. In support of this position, respondent argues that the instant case is controlled by Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. a Memorandum Opinion of this Court; Diamond v. Commissioner, 92 T.C. 423 (1989), on appeal (4th Cir., Oct. 16, 1989); Levin v. Commissioner, supra; and Green v. Commissioner, supra.
Petitioners recognize that the Partnership was not "carrying on" a trade or business during the relevant taxable years, *86 but they contend that amounts expended by the Partnership for research and development were "in connection with" a trade or business which might be carried on by the Partnership in the future. Petitioners argue that Spellman, Levin, and Green are not controlling in that in each of those cases the partnerships relinquished their rights to exploit the results of the research and development before the research and development was performed and the technology was developed. Thus, unlike Spellman, Levin, and Green the Partnership in the instant case owned the technology after the research was performed and the technology was developed, and it had the potential to exploit the technology itself or to enter into an arrangement with a third party to exploit the technology. The Partnership and RRR entered into an R & D Agreement whereby RRR agreed to use its best efforts to conduct research and perform engineering and development services necessary for the development of a desktop computer system and to deliver to the Partnership at least one prototype of the computer system. Simultaneously with the execution of the R & D Agreement, the Partnership and RRR entered *87 into an Option and Non-Exclusive License Agreement, an Option and Exclusive License Agreement, and an Option and Purchase Agreement. Pursuant to the Option and Non-Exclusive License Agreement, RRR was granted the option to acquire a non-exclusive license for the purpose of manufacturing, marketing, licensing, selling or otherwise disposing of the computer system. Such option was exercisable within 10 days after delivery of the prototype and the license was non-exclusive for a period of 13 months after delivery of the prototype. Under the terms of the Exclusive License Agreement, and Option and Purchase Agreement, at the end of the non-exclusive license period, RRR had the option to either enter into an Exclusive License Agreement with the Partnership and/or purchase the technology from the Partnership. Thus, during the research and development period and the non-exclusive license period, the Partnership retained ownership of the technology. However, it does not follow that merely because the Partnership may be legally entitled to the resultant technology, it is therefore entitled to deduct the corresponding research and development expenses pursuant to section 174. The question *88 in the instant case is whether the Partnership would likely engage in a trade or business in the foreseeable future. In Diamond v. Commissioner, supra, the taxpayer was a limited partner in Robotics which was a limited partner in a project partnership. The project partnership, whose general partner was Elco, was formed to conduct research and development work with respect to an arc welder with an optical seam follower. Pursuant to the project partnership agreement, Elco was to contribute to the project partnership a sum certain of money and "the exclusive right, title, and interest in all the Technology which it presently possesses as well as any Technology conceived, made, gained, acquired or developed in the course of or as a result of the implementation of the Project." 92 T.C. at 428. Robotics was to initially contribute $ 500,000 and make monthly cash installments thereafter. Section 5(a)(ii) of the project partnership agreement conferred upon Elco complete control over the research and development phase of the project. Pursuant to section 5(a)(iii) Elco was granted an option, which was exercisable at any time, giving Elco the right to *89 manufacture, produce, and/or market the welder as an exclusive and irrevocable license. The issue in Diamond was "whether section 5(a)(iii) constitutes a license of the type before us in Levin or, as petitioner argues, an option to acquire a license." 92 T.C. at 428. The taxpayer in Diamond argued that Levin is distinguishable since there is a possibility that Elco would not exercise its right pursuant to the option, and the door would be open for the project partnership or Robotics to exploit the results of the research. In adopting the reasoning of the Seventh Circuit in Spellman v. Commissioner, supra, we held in Diamond that we need not decide whether section 5(a)(iii) is the equivalent of the license as in Levin "since even if it does constitute an option, there is no realistic prospect that the robot would ever be exploited in any trade or business carried on by any one other than Elco." Diamond v. Commissioner, 92 T.C. at 439. In Spellman, the taxpayer was a limited partner in a partnership created to invest in another limited partnership, Sci-Med. Sci-Med was formed for the purpose of engaging *90 in the research and development of antibiotic drugs. Teva Pharmaceutical Industries, Ltd. (Teva) agreed to undertake a research and development program for Sci-Med under a sub-research and development agreement. Teva was given the exclusive right to market the antibiotics developed under the project and Sci-Med was to become the owner of any byproducts developed under the agreement which were not developed as part of the project. Teva was given the exclusive right to use those byproducts in connection with the exploitation of the antibiotics developed as part of the project, and was given the further option to purchase the remainder of Sci-Med's rights in these byproducts for $ 20,000. The Seventh Circuit affirmed the Tax Court, not on the basis of the exclusive license agreement, but rather, because of the substance of Teva's option to purchase from Sci-Med the byproducts of the research for $ 20,000. Whatever Sci-Med's desires, Teva's option to acquire for only $ 20,000 all rights in the byproducts will prevent Sci-Med as a practical matter from ever entering the pharmaceutical business as a result of the venture with Teva. If the byproducts turn out to be worth more than *91 $ 20,000, Teva will exercise the option and Sci-Med will have no products to make or sell; if the byproducts turn out to be worth less, Sci-Med will have the right to market them but will not exercise the right because the costs would exceed the possible profits. [Spellman v. Commissioner, 845 F.2d at 151.] Thus, in applying this reasoning in Diamond, we decided that: Elco would surely exercise its right under section 5(a)(iii) if the project was anticipated to be profitable enough to justify incurring the costs of manufacturing and marketing the robot. Elco would already have in place part of the infrastructure necessary for it to pursue those activities, since Elco was itself a high technology firm, and it and/or its subsidiary performed the research and development work. However, should the robot appear to be unprofitable, Elco would decline to exercise its rights under section 5(a)(iii), leaving the project partnership or Robotics with the right to develop an asset whose costs would not appear to justify additional investment. Absent Elco's participation, neither of these parties would have the necessary infrastructure to undertake to manufacture *92 the robot * * *. [Diamond v. Commissioner, supra at 440-441.] * * * The substance of the transaction before us is that Elco the independent corporation had complete control over the research and development phase of the project through its subcontracts with the project partnership pursuant to section 5(a)(ii) of the project partnership agreement. Section 5(a)(iii) extended such control to the production and marketing of the robot. Elco left no room for Robotics or any other party to have a say in the affairs of the project. [Diamond v. Commissioner, supra at 443.] In the instant case, RRR was incorporated on December 1, 1981. On December 2, 1981, the Partnership was formed to fund the research and development necessary to create the computer product. After executing the four agreements on December 4, 1981, relating to the research and development, marketing, and production of the technology, the Partnership, like the partnerships in Levin and Green, engaged in purely ministerial activities. It collected subscription money and maintained a bank account from which it paid legal and accounting fees, and filed Federal *93 partnership income tax returns. We point out here that in Levin and Green, unlike the instant case, the agreements entered into between the partnerships and the research and development contractors effectively deprived the partnerships of control over marketing, manufacture, and sale of the technology for virtually the entire lives of the partnerships. However, in concluding that the partnerships never intended to engage in a trade or business, we found as supporting factors the passive nature of the partnerships and the limited nature of the partnerships' activities following formation. Thus, although Levin and Green are factually distinguishable from the instant case, we, nevertheless, find these factors to be equally persuasive and applicable in the instant case. In addition to the passive nature and limited activities of the Partnership, we find that the Partnership had no power to direct or control any aspect of the research and development process. Although the R & D Agreement called for monthly status reports and a representative of the general partner of the Partnership met with representatives of RRR to discuss the project, this monitoring of RRR's activities *94 was informational: to keep the Partnership informed of RRR's financial status and progress in the research and development of the technology. There is no evidence that the Partnership, or this individual, was involved in, directed, or controlled any phase of the research and development of the project itself. Diamond v. Commissioner, supra at 443. The effect of all of this is that the Partnership never demonstrated that it intended to engage in a trade or business at any time in the future with respect to the resultant technology. The Partnership was merely a passive investor since its formation and had no effective control over the research and development of the project. With respect to the marketing and sale of the resultant technology, at the time the prototype was delivered, RRR would exercise the Non-Exclusive Option if, in the exercise of sound business judgment, RRR determined it could market and produce the results of the research and development on a profitable basis. RRR intended on making a profit, not from the research and development fee but, rather, from the marketing and sale of the computer product. Thus, during the 13-month non-exclusive *95 license period, RRR could market and manufacture the computer product. At the end of the non-exclusive license period RRR, as a high technology firm, would have in place the infrastructure necessary to market and produce the computer product. It would exercise the Exclusive Option and/or the Option and Purchase Agreement if the marketing and sale of the computer product were in fact profitable. Thus, even though the Partnership owned the technology after the research and development period and during the non-exclusive license period, it would have the opportunity to engage in a trade or business with respect to the technology developed only if RRR decided at the end of the non-exclusive license period that it would be uneconomical to do so. Diamond v. Commissioner, supra at 441. The Court filed its opinion in Diamond on February 23, 1989, and reply briefs in the instant case were due on April 17, 1989. Petitioners failed to distinguish or cite Diamond in their reply brief. In addition, petitioners did not discuss or attempt to distinguish the Court of Appeals opinion in Spellman. Petitioners concede in their reply brief that if the technology *96 developed under the R & D Agreement were "wildly successful," RRR would certainly have exercised its option to license the technology and, if the technology were a total failure, neither RRR nor the Partnership would have exploited the technology. Petitioners contend, however, that as of December 1981 the evidence reflected that it was more probable that the technology would not be a wild success or a total failure. In that event petitioners claim that the most likely scenario was that RRR would not exercise its option because it would not have the capability of marketing the technology and, therefore, the Partnership would take the lead and market the technology. After reviewing all of the evidence in this case, we cannot conclude that as of December 1981 it was more probable that the technology would not be a wild success or a total failure. In addition, at the time the prototype was delivered, RRR would surely exercise its option to license the technology on a non-exclusive basis for a period of 13 months if it determined that it would profitable to do so, no matter the degree of profitability. In addition, RRR would make this determination again, at the end of the non-exclusive *97 license period. RRR did not intend on making a profit from its receipt of the research and development fee. The fee was to provide RRR with adequate working capital and financial resources for the performance of the research and development project. RRR regarded the marketing and sale of the computer product as the means of making a profit. It is highly unlikely that RRR, already engaged in the computer business, would decline to market and sell the resultant technology if there was any likelihood of making a profit. RRR was incorporated by Beningson, Grace, Hebert, and Schlaffer. Their collective ownership of its outstanding stock represented 25 percent of its voting power. Beningson was the financial promoter of the project. Grace, Hebert, and Schlaffer developed the concept that was the subject of the project. The latter three were undoubtedly intimately involved in the development of the concept after all of the entities and agreements were in place. They would be in the best position to evaluate the profitability of the venture and by virtue of the options were in the prime position to exploit the technology. By contrast, there is no evidence that the Partnership had *98 any technical expertise with which to capitalize upon the technology should RRR not exercise its options. Given the respective interests of Beningson, Grace, Hebert, and Schlaffer, it is hard to imagine a scenario in which they would fail to recognize the potential profitability and, in turn, cause RRR not to exercise its options. The interest of Beningson was primarily financial but the interest of Grace, Hebert, and Schlaffer, as the initial developers of the concept, gave them strong incentives to profit on their past efforts. We see nothing comparable to this strong interest in the Partnership except for Beningson through his ownership of the corporate stock of York, the general partner. It was extremely unlikely that RRR would fail to exercise its options in the event of projected profitability and the Partnership would engage in the trade or business of manufacturing and selling the concept. In summary, due to the passive nature and limited activity of the Partnership as well as the Partnership's lack of control over the research and development of the project, we find that the Partnership never intended to enter into a trade or business with respect to the technology developed. *99 Furthermore, the contractual arrangements between the Partnership and RRR made the prospects unrealistic that the Partnership would ever be capable of entering into a trade or business with respect to the technology developed. In so holding, we expressly adopt the reasoning as set forth in Diamond and Spellman. Because the Partnership did not incur research and development expenses "in connection with" a trade or business, it is not entitled to deduct expenditures for research and development pursuant to section 174. In light of the foregoing, we hold that petitioners are not entitled to any deductions attributable to losses of the Partnership with respect to the taxable years 1981 and 1982. The next issue for our decision is whether petitioner Willis M. Everett, III, is liable for an addition to tax pursuant to section 6653(a)(1) and (2) for the taxable year 1981 and whether petitioners Neal M. and Joan W. Allen are liable for an addition to tax pursuant to section 6653(a)(1) and (2) for the taxable years 1981 and 1982. Section 6653(a)(1) imposes an addition to tax in the amount *100 of 5 percent of an underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules and regulations. Section 6653(a)(2) imposes a further addition to tax in an amount equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. Negligence is defined as a failure to exercise the due care that a reasonable and ordinarily prudent person would under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners have the burden of proving that their underpayment of tax was not attributable to negligence or intentional disregard of the rules and regulations but rather was due to reasonable cause. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). We have found as facts that petitioners consulted friends who were knowledgeable in the computer field as well as consulted their tax advisors regarding the legal and tax aspects of the investment prior to purchasing their respective limited partnership interests. In addition, we have found that the company that employed Everett and Alan had resources available which petitioners were able to use *101 in researching the investment. As a result, we find that petitioners' independent investigation of their investment as well as their consulting individuals in the computer field and tax advisors is the type of reasonable and prudent action contemplated by the statute. We find for petitioners with respect to this issue. The final issue for our decision is whether petitioners are liable for additional interest pursuant to section 6621(c). [4]Section 6621(c) provides for increased interest where there is an underpayment of taxes in excess of $ 1,000 attributable to tax-motivated transactions in any year. This section applies only with respect to interest accruing after December 31, 1984, even though the taxpayer entered into the transaction before the date of the enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent contends that all of petitioners' deficiency is a substantial understatement attributable to a tax-motivated transaction, specifically that *102 the transaction was a "sham" within the meaning of section 6621(c)(3)(A)(v). Section 6621(c)(3)(A)(v) includes "any sham or fraudulent transaction" in the definition of tax-motivated transactions. We have interpreted this language to mean transactions which are devoid of economic substance. Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. without published opinion Patin v. Commissioner, 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Cherin v. Commissioner, 89 T.C. 986, 1000 (1987). In the instant case, we have not decided that the transactions which petitioners entered into are devoid of economic substance and we do not find that the transactions are "shams" within the meaning of section 6621(c)(3)(A)(v). We hold for petitioners *103 with respect to this issue. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. These cases have been consolidated for purposes of trial, briefing, and opinion.↩
2. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years 1981 and 1982, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Joan W. Allen is a petitioner herein solely by reason of having signed a joint Federal income tax return with her husband. * 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of the rules or regulations.↩
4. Sec. 6621(d) was renumbered as sec. 6621(c)↩ by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744.