928 F.2d 1135
 Unpublished Disposition
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Randall S. GOULDING and Robyn L. Goulding, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 Nos. 89-3579, 89-3661.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 14, 1989.
Decided March 22, 1991.
Rehearing Denied June 13, 1991.
 
 Appeals from the United States Tax Court.
 USTC
 AFFIRMED.
 Before CUMMINGS and MANION, Circuit Judges, and ROBERT A. GRANT, Senior District Judge*.
 ORDER
 In 1984, the Commissioner of Internal Revenue notified Randall Goulding and Robyn Goulding of deficiencies in income tax for 1979 and 1980. The Gouldings challenged the deficiencies by filing a petition with the Tax Court in June 1984. After trial in September 1987, the Tax Court found deficiencies of $26,506 for 1979 and $29,379 for 1980. The Gouldings appeal, and we affirm.
 I.
 In the early 1980's, Randall Goulding, who at the time was a tax attorney, organized and invested in (through a grantor trust) a limited partnership known as Brandon Woods Associates. Brandon Woods acquired the rights to an invention known as a Modular Individualized Soilless Culture system (MISC). Brandon Woods then, in turn, contracted with Ag-Re-Co, Inc. to perform research on and develop the MISC, and also to grow, perform research on, and eventually market a test crop of ginseng and ginseng-related products.[1]
 For the year 1982, Brandon Woods, an accrual basis taxpayer, reported $44,000 in cash deductions ($24,000 to Ag-Re-Co, and $20,000 to the Ginseng Research Institute (GRI) and $132,000 in accrued deductions (future obligations to Ag-Re-Co) for research and development expenditures. A portion of this expense passed through to Goulding's grantor trust, a limited partner, and eventually made its way to Goulding's joint tax return as part of a larger deduction. Since the 1982 return reflected a net operating loss, Goulding carried this loss back to his 1979 return, thus reducing his 1979 tax liability.
 The principal issue in this case is whether Brandon Woods was entitled to deduct the research and development expenses it claimed in 1982. Since research and development costs yield benefits over a period of time rather than when incurred, they are most properly considered capital expenditures. See Spellman v. C.I.R., 845 F.2d 148, 149 (7th Cir.1988). Nevertheless, 26 U.S.C. Sec. 174(a)(1) allows a taxpayer to deduct as a current expense "research or experimental expenditures which are paid or incurred ... during the taxable year in connection with his trade or business." Up until 1974, the Tax Court had limited the research and development expense deduction to established businesses. But in Snow v. C.I.R., 416 U.S. 500 (1974), the Supreme Court held that firms that as yet had no business other than the research they were conducting--in other words, new or start-up firms developing products or services to eventually produce and market--were entitled to the Sec. 174(a)(1) deduction. See also Levin v. C.I.R., 832 F.2d 403, 405 (7th Cir.1987).
 In determining whether Brandon Woods could properly deduct research and development costs for 1982, the Tax Court had to determine whether Brandon Woods was actually conducting a trade or business when it incurred the costs or, if not, whether a reasonable likelihood existed at the time that Brandon Woods would in the future be conducting a trade or business. See Spellman, 845 F.2d at 149. Since it is apparent Brandon Woods was not actively engaged in any trade or business by the end of 1982 (its only activities before that time being to organize, acquire the MISC, and contract with Ag-Re-Co and the GRI for research services) the decision in this case focuses on whether Brandon Woods was reasonably likely to conduct a trade or business in the future. In other words, was Brandon Woods the up-and-coming start-up business Snow interpreted Sec. 174(a)(1) to apply to? Was Brandon Woods likely to actually develop, with the hope of marketing, products or services? Or, was Brandon Woods merely a device to pump money into Ag-Re-Co, the entity that was really carrying on the business? See Spellman, 845 F.2d at 149-50.
 These questions "have at their core fact specific questions of characterization on which we must accept the Tax Court's findings unless clearly erroneous." Levin, 832 F.2d at 405. See also id. at 406. The answers to these factual questions in this case turned, in large part, upon the interpretation of several contracts Brandon Woods entered with Ag-Re-Co (an Exclusive License Agreement, a Services Contract, and an Invention Development Contract). The Tax Court, in a thorough opinion, traversed through the maze of contracts Brandon Woods entered into and analyzed the voluminous record compiled at trial. The court concluded that Brandon Woods was not engaged in a trade or business during 1982 and was not going to engage in a trade or business in the future, and therefore disallowed the research and development deduction for 1982. For the most part, we agree with the Tax Court's interpretation of Brandon Woods' contracts, and find its factual findings--most importantly, the ultimate finding about whether Brandon Woods incurred the research expenses in connection with its own trade or business--not to be clearly erroneous. Therefore, we adopt the Tax Court's opinion on this issue, with some minor alterations to take account of issues not relevant to this appeal, and several of the Tax Court's factual and legal findings that Goulding disputes but that do not affect the case's outcome. A copy of that opinion, as edited, is attached to this order as an appendix.
 We comment briefly on several of Goulding's specific arguments on appeal. Goulding asserts generally that Brandon Woods retained the capacity to engage in a trade or business. However, in the abstract everybody has the "capacity" to engage in a trade or business. The real question here is not Brandon Woods' "capacity" to conduct a business; it is whether any realistic likelihood existed that Brandon Woods actually would conduct a business. See Spellman, 845 F.2d at 149; Levin, 832 F.2d at 406.
 More specifically, Goulding argues that the district court erred in holding that in the Exclusive License Agreement Brandon Woods "licensed all its rights and interests in the MISC system and ginseng agronomic improvements and technology to Agreco, Inc." Appendix at 4 (Tax Court opinion). According to Goulding, the Exclusive License Agreement was limited to the MISC. The Tax Court analyzed the Exclusive License Agreement at pages 4 and 5 of its opinion. We agree with that analysis and need not repeat it. We do note, however, that Brandon Woods' Private Placement Memorandum supports the Tax Court's interpretation. The Private Placement Memorandum (PPM) states that Brandon Woods has given Ag-Re-Co an exclusive license for the "Inventions," which are defined as the MISC and "ginseng growing techniques." (PPM at 15, 17.) The Private Placement Memorandum goes on to state that the Exclusive License Agreement grants "all rights to use and exploit the Inventions [i.e., the MISC and ginseng growing techniques] for the life of the inventions plus the life of any improvements." (PPM at 26.) Furthermore, according to the Private Placement Memorandum, Ag-Re-Co "is also the licensee and marketer of the products to be developed." (PPM at 18.) Finally, Brandon Woods
 shall have no ownership interest in the prototypes of the test crop. Instead, these shall belong to the respective Licensees [i.e., Ag-Re-Co].... Only the intangible embodiments of the research and development efforts shall become the property of the Partnership, subject to the Exclusive License Agreement [which granted Ag-Re-Co "all rights" to use and exploit the MISC and ginseng growing techniques]."
 (PPM at 28, emphasis added.) Given this language describing the License Agreement from the Private Placement Memorandum, which Goulding himself drafted (along with the License Agreement), it is specious for Goulding to assert that there is no support in the record for the Tax Court's interpretation of the License.
 Goulding also asserts that Brandon Woods controlled Ag-Re-Co's research efforts. While several provisions in the Invention Development Agreement called for Brandon Woods' "research staff" to direct Ag-Re-Co's research, that research staff was comprised entirely of people also employed by Ag-Re-Co. These people included Alan Zech, Ag-Re-Co's president and part owner. Given that, it was reasonable to conclude the research staff was really working for Ag-Re-Co, not Brandon Woods, so that any direction by the research staff was really direction by Ag-Re-Co itself.
 Goulding also asserts that Brandon Woods owned other inventions and technology besides the MISC and the ginseng agronomic improvements, and that this shows Brandon Woods was capable of engaging in business. The Tax Court found, however, that Goulding failed to prove that even if Brandon Woods owned these other technologies, it could exploit them in a trade or business. Appendix at 18 n. 25. This finding is not clearly erroneous. Goulding does not explain how Brandon Woods planned to or could have exploited these technologies.
 Goulding quibbles about other factual findings the Tax Court made. Where necessary, we have edited the Tax Court's opinion to take account of some of Goulding's arguments. However, none of these arguments shakes our conclusion that the Tax Court's ultimate finding--that Brandon Woods was not engaged in a trade or business in 1982, and was not reasonably likely to engage in one in the future--was not clearly erroneous.
 II.
 Goulding raises several other issues on appeal. For the tax year ending January 31, 1983, Goulding's law practice, a Subchapter S corporation, reported a loss of $14,839. That loss was comprised, in part, of a $57,009 deduction for "professional fees" and a $10,247 deduction for "travel." Goulding and his wife claimed a net operating loss of $69,835 on their 1983 joint tax return, a loss that included the loss from his law practice. In his petition in this case, Goulding claimed a net operating loss for the year 1983, which he carried back to 1980. The Tax Court disallowed these deductions, holding that Goulding had presented no evidence to substantiate them.
 Goulding argues that the Tax Court should have allowed the deductions. Since Goulding first raised the issue of a 1980 net operating loss (and hence the deductions) in his Tax Court petition, he would normally have the burden of substantiating the deductions. See Tax Court Rule 142(a). Goulding argues, however, that the burden of proof should have shifted to the Commissioner. This is so, says Goulding, because the IRS had possession of his law office records and did not return those records until four days before trial.
 Goulding has presented no authority for his contention that the late return of his records should have shifted the burden of proof to the Commissioner. Thus, he has waived this argument. See Beard v. Whitley County REMC, 840 F.2d 405, 408-09 (7th Cir.1988). Even if Goulding had not waived this issue, we would not reverse the Tax Court's decision. Tax Court Rule 142(a) does allow the court to decide to shift the burden of proof. Assuming late return of records is a proper ground for shifting the burden, the Tax Court is in the best position to determine whether a burden shift is warranted. Thus, we will review the Tax Court's decision on this issue deferentially. We do not think the Tax Court abused its discretion in deciding that Goulding had sufficient time to prepare for trial. As the court noted, the two claimed deductions were substantial, and represented noteworthy expenditures. It does not seem unreasonable to have expected Goulding to be able to prepare to substantiate those deductions in a short period of time.
 Goulding also asserts that the Tax Court also erred in disregarding two agreements between him and the IRS. The first of these agreements concerns net operating loss carrybacks from Goulding's purchase of solar equipment. Goulding asserts that he and the Commissioner had agreed to defer any hearing on that issue in the Tax Court until sometime after the trial but that the Tax Court went ahead and denied these benefits without a hearing. But the record reflects only that Goulding and the Commissioner agreed that any loss resulting from the solar equipment purchase would not be tried in the Tax Court, and that the parties would "presume" that the loss did not exist for 1982. The agreement held open the possibility that Goulding might be able to litigate the issue in a claim for refund; nothing in the record, however, indicates that the parties agreed to have the Tax Court decide the issue. (See Govt.Br. 45.)
 The second agreement with the Tax Court concerned deductions Goulding had taken in connection with a partnership known as IFSD. In his opening brief, Goulding claims (without citing the record) that he and the Commissioner agreed that he could deduct his "out-of-pocket cash investment in IFSD." In his reply brief, however, Goulding modified his stance (apparently in response to the Commissioner's assertion, supported by citation to the record) asserting only that the agreement was to allow Goulding to deduct 50% of his cash investment in IFSD. The only record support is for an agreement to allow a 50% deduction. We presume the misstatement in Goulding's opening brief was inadvertent.
 Be that as it may, the question is whether the Tax Court improperly disregarded the parties' agreement and, as a result, failed to allow Goulding any deduction for the IFSD partnership. The Commissioner asserts that Goulding had to substantiate his investment in IFSD and, despite repeated requests, never provided the documents to do so. Goulding, however, asserts (in his reply brief; the discussion in his opening brief is, at best, sparse) that he did substantiate his cash investment.
 The Tax Court, after reviewing memoranda from the parties making these assertions, computed Goulding's tax liability without allowing any IFSD deductions. We agree with the government that in doing so, the Tax Court implicitly decided the disputed factual issue--that is, whether Goulding adequately substantiated his cash investment--against Goulding. In other words, the Tax Court believed the Commissioner's version of events. True, the Tax Court did this without actually hearing evidence on the issue, but Goulding never asked for an evidentiary hearing. Moreover, Goulding has not provided any basis for us to conclude that the Tax Court's finding was clearly erroneous. Therefore, we hold that the decision not to allow the IFSD deductions, despite the parties' agreement, was not reversible error.
 Goulding finally argues that the Tax Court judge was biased and should have recused himself. Goulding's opening brief does not cite any authority stating the grounds for which a judge must recuse himself, or the standard we must apply in reviewing a trial judge's decision not to recuse. Instead, Goulding presents a litany of adverse decisions and other events that he says demonstrate the judge's bias against him.
 Goulding's argument is unpersuasive. "Bias cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it 'in' for the party for reasons unrelated to the officer's view of the law, erroneous as that view might be." McLaughlin v. Union Oil Co. of California, 869 F.2d 1039, 1047 (7th Cir.1989).[2] After reviewing the record in this case (including the entire transcript), we find nothing in Goulding's litany of events that evidences any bias by the judge against Goulding unrelated to the judge's view of the law. In fact many of Goulding's assertions appear to be exaggerated or plain wrong. For example, Goulding asserts that the judge unilaterally decided three weeks before trial that Brandon Woods would be the test case partnership. The record belies this assertion. Goulding himself requested that Brandon Woods be the test case, after "recogniz[ing] a problem he might have with Kennicott...." Tr. 9/25/87, at 8-9.
 Goulding also makes much of the judge's reaction when he learned that Rashap had not prepared his own expert report. While Goulding's preparing the document in Rashap's absence may have been well intended, the judge's conclusion otherwise seems eminently reasonable given that Goulding did not take the trouble to explain the circumstances surrounding the report's presentation before introducing it.
 There is no need to cite other examples. It suffices to say that Goulding's argument that the judge should have recused himself, like his other arguments on appeal, does not present grounds for reversing the Tax Court's judgment.[3]
 AFFIRMED.
 APPENDIX
 T.C. MEMO 1988-212
 UNITED STATES TAX COURT
 Docket No. 18230-84.
 Filed May 12, 1988.
 Randall S. Goulding, for the petitioners.
 Andrew P. Fradkin and John P. Jankowski, for the respondent.
 MEMORANDUM FINDINGS OF FACT AND OPINION
 FAY, Judge.
 
 
 1
 Respondent determined deficiencies and additions to petitioners' Federal income tax as follows:
 
 
 2
 YEAR DEFICIENCY SEC. 6653(a) 1 ADDITION TO TAX
1979 $45,148 $2,258
1980 31,405 1,570
 
 
 3
 All issues relating to the notice of deficiency have been disposed of by agreement of the parties, leaving for decision the amount, if any, of net operating loss carrybacks from the 1982 and 1983 taxable years. The specific issues with respect to such carrybacks are: (1) whether petitioners are entitled to losses from four partnerships for the 1982 taxable year, [and] (2) whether petitioners have satisfied their burden of proof with respect to a $57,009 legal fee deduction and a $10,247 entertainment deduction....
 
 FINDINGS OF FACT
 
 4
 Some of the facts have been stipulated. The stipulated facts and stipulated exhibits are incorporated herein by reference.
 
 
 5
 Petitioners, husband and wife, resided in Deerfield, Illinois, at the time the petition in this case was filed.
 
 
 6
 Petitioner husband worked for the Internal Revenue Service from 1971 to 1978 as a Special Agent and as a Revenue Agent. In 1978, petitioner husband became an attorney, working primarily in the field of Federal income taxation until the mid-1980s. At the time of trial, September of 1987, petitioner husband was working as a personal injury attorney.
 
 
 7
 As a tax attorney, petitioner husband organized and/or served as tax counsel for several limited partnerships, the common features of which were large leveraged research and development expenditures purportedly deductible from ordinary income and gains purportedly taxable at then preferential long-term capital gain rates.[2] Four such partnerships, Brandon Woods Associates, Kirkwood Associates, Kennicott Ridge Associates, and Kimberly Hills, Ltd., (the "BKKK partnerships") are at issue herein.
 
 
 8
 Each of the BKKK partnerships contracted to have performed on its behalf research and development on an invention relating to ginseng and on ginseng crops. Ginseng is an herb root revered primarily by Asian cultures for its medicinal purposes. Brandon Woods Associates' invention was the Modular Individualized Soiless Culture ("MISC") system. The other BKKK partnerships used various other inventions.
 
 
 9
 The parties, at the behest of the Court, have agreed that the Court is to consider only Brandon Woods Associates with the results reached with respect thereto applicable to the other BKKK partnerships. Further, pursuant to the Court's order granting respondent's motion to strike 1983 partnership items for lack of jurisdiction, the 1983 partnership items are not before the Court.[3] Accordingly, with respect to the BKKK partnerships, the Court will only consider Brandon Woods Associates' deductions for the 1982 taxable year.
 
 
 10
 Brandon Woods Associates ("Brandon Woods") was formed on January 1, 1980, as an Illinois limited partnership with petitioner husband as the original limited partner[4] and Stephen Goldstein as the general partner. In late 1982, Joseph Townsend replaced Mr. Goldstein as the general partner. On or prior to December 31, 1982, less than two limited partnership units ("LPUs"), out of a total of 35, were sold to 3 individuals[5] and a law partnership.[6]
 
 
 11
 A Private Placement Memorandum dated July 18, 1983, was prepared in connection with further sales of LPUs in Brandon Woods and, in 1983, the remaining LPUs in Brandon Woods were sold. The cost of each LPU was $25,000 cash plus a deferred obligation of $76,307.76 payable in 18 equal annual installments of $4,239.32 ("annual acquisition payment"), with the first such payment due January 1, 1985.
 
 
 12
 In connection with its Ginseng activities, Brandon Woods entered into several contracts, the execution dates and relevant portions of which are described below:
 
 
 13
 A. Assignment Agreement Executed September 1, 1982
 
 
 14
 Rodney Wolf, petitioner husband's brother-in-law, and Alan Zech, petitioner husband's former office mate while a Special Agent for the IRS, assigned their interest in the MISC system to Brandon Woods for one-quarter of one percent of any and all gross revenues received by Brandon Woods from the exploitation of the MISC system. Mr. Wolf and Mr. Zech represented by recitals in the Assignment Agreement that they were the sole owners and creators of the MISC system.[7]
 
 
 15
 B. Exclusive License Agreement Executed January 14, 1983
 
 
 16
 Brandon Woods exclusively licensed all its rights and interests in the MISC system and ginseng agronomic improvements and technology to Agreco, Inc. ("Agreco"), an Illinois corporation owned 48 percent by Mr. Zech, 34 percent by Robert Gale, petitioner husband's cousin, and 18 percent by Frances Mudloff.[8] Agreco agreed to pay three types of royalties to Brandon Woods: a minimum royalty of $10,000 due in 1982, 18 annual royalty payments of $300,000 due on January 25 of 18 consecutive years beginning in 1985, and a percentage royalty of ninety percent of all of Agreco's gross sales revenues and gross income derived from the MISC system and ginseng test crops.[9] The Exclusive License Agreement contemplates that Agreco is to market the MISC system and ginseng test crops to the exclusion of all others, including Brandon Woods.
 
 
 17
 C. Invention Development Contract Executed December 31, 1982
 
 
 18
 Agreco agreed to perform services for Brandon Woods, which services were vaguely described in section IV of the Private Placement Memorandum and the Invention Development Contract itself. Such services included the growing of 20 acres of ginseng test crops, developing the MISC system, and performing research and development on both.[10] Brandon Woods agreed to pay Agreco a total of $3,495,000 ("invention development cost"), as follows: $24,000 on or before December 31, 1982, $746,000 on or before December 31, 1983, and 18 equal annual installments, including interest of 15 percent, each in the amount of $447,922.46 ("annual development payment"), with the first payment due January 25, 1985.
 
 
 19
 The Invention Development Contract grants Brandon Woods no control over the development, production, or marketing of the MISC system or the ginseng test crops[11] and states that Agreco is to be the owner of "any property acquired or improved for use in connection with research and experimentation," which includes prototypes of the MISC system and the ginseng test crops.[12] Further, the Invention Development Contract provided for the disclosure and assignment to Agreco, or retention by Agreco, of all inventions, developments, and technologies relating to the services to be performed by Agreco pursuant to such contract.[13]
 
 
 20
 D. Services Contract Executed January 15, 1983
 
 
 21
 Agreco agreed to produce, market, and sell for Brandon Woods items encompassing the technology covered by the Exclusive License Agreement. Brandon Woods agreed to pay Agreco annually $3,000 plus 97 percent of all direct and indirect costs incurred by Agreco in connection therewith ("services contract payment")[14] in any year in which percentage royalties exceeded $300,000....
 
 
 22
 Brandon Woods never had any employees. To the extent it conducted any activities, such activities were conducted by (1) Mr. Townsend, Brandon Woods' general partner, (2) petitioner husband, or (3) Agreco.[15]
 
 
 23
 Mr. Townsend had no experience with ginseng prior to becoming involved with the BKKK partnerships. He previously had owned a nightclub, managed and booked bands, and traded and brokered commodities. His first year of involvement with the BKKK partnerships was spent learning about the ginseng industry. Mr. Townsend visited the farm owned by Agreco on which ginseng test crops were grown (the "Agreco farm") and the office shared by each of the BKKK partnerships, Agreco, and petitioner husband's law practice (the "joint office") on several occasions. For the most part, Mr. Townsend acted in a manner consistent with Mr. Zech's and petitioner husband's desires.[16]
 
 
 24
 Petitioner husband, the original limited partner and an owner of 80 percent of one LPU in Brandon Woods, served as counsel to Brandon Woods, had signature authority over Brandon Woods' checking account, and, pursuant to a power of attorney executed by Mr. Townsend, was authorized to act on behalf of Brandon Woods. Petitioner husband drafted the Private Placement Memorandum and all other significant documents. Petitioner husband visited the Agreco farm twice and was necessarily in the joint office on a regular basis as his law practice was operated from there. Petitioner husband's activities for Brandon Woods, other than his organizational and promotional services, were basically legal or administrative in nature.
 
 
 25
 The bulk of all activities conducted on behalf of Brandon Woods were conducted by Agreco, the day-to-day activities of which were controlled by Mr. Zech. The three major activities conducted by Agreco on behalf of Brandon Woods were (1) the development of the MISC system, (2) the growing of ginseng test crops, and (3) research and experimentation on the ginseng test crops.
 
 
 26
 Agreco engaged the services of Rodmar, Inc., a corporation owned by Mr. Wolf, petitioner husband's brother-in-law and co-inventor with Mr. Zech of the MISC system, to manufacture a prototype of the MISC system. A MISC system prototype was partially constructed by Rodmar, Inc. No ginseng has ever been grown in the prototype. The prototype is basically a table, which when completed, could support the hydroponic growing of ginseng and other root plants.
 
 
 27
 Agreco was to grow 20 acres of cultivated ginseng on behalf of Brandon Woods to serve as test crops. The following chart reflects the acres of ginseng grown by Agreco, and the portion thereof which was grown for Brandon Woods.
 
 
 28
 YEAR TOTAL GROWN PORTION FOR BRANDON WOODS
1982 17.2 1.4
1983 31.14 1.73
1984 21.52 3
1985 2.64 0
 ------------------------- ----
TOTAL 72.5 18.1
 
 
 29
 Agreco was to perform research and experimentation on the ginseng test crops and was to engage in efforts to establish a standard for measuring the active ingredients in ginseng. These activities, to the extent performed, were performed directly or indirectly by Agreco. Agreco engaged the services of various members of the faculty of the University of Wisconsin to perform some of these services.
 
 
 30
 In late 1984 or early 1985, the IRS audited Agreco and the BKKK partnerships. Partners owning thirty percent of Brandon Woods LPUs did not make their ... annual acquisition payments [due at the end of 1985]. As a result thereof, Brandon Woods was not able to make in full its ... $447,922.46 annual development payment to Agreco and Agreco did not make its ... $300,000 annual royalty payment to Brandon Woods. Pursuant to an order of the United States District Court, solicitation of payment of the annual acquisition payments was prohibited for 1986 and later years. No annual development payments or annual royalty payments were made by Brandon Woods and Agreco, respectively, for 1986 or later years. Since the time of the audit, Brandon Woods has done little if anything except engage in litigation.
 
 
 31
 Because of the severe impairment of Agreco and the BKKK partnerships occasioned by the IRS audit, Agreco sold the Agreco farm in 1985 to Harry Lowrance, an investor in the BKKK partnerships and a son of Mrs. Mudloff, owner of 18 percent of Agreco. By separate assignment agreements, Agreco assigned the ginseng growing on the Agreco farm to Mr. Lowrance. The assignment agreements make no reference to Brandon Woods', or any of the other BKKK partnerships', interests in the growing ginseng.
 
 
 32
 Brandon Woods is an accrual basis taxpayer. Its 1982 U.S. Partnership Return of Income reported a $10,000 long term capital gain and $176,285 of "other deductions" consisting of $44,000 of cash deductions for research and development ("R & D"), $132,000 of accrued deductions for R & D, and $285 of professional and filing fees deductions. The $44,000 of cash deductions are represented by a $20,000 check to the Ginseng Research Institute and a $24,000 check to Agreco. Both checks are signed by petitioner husband, are dated December 31, 1982, and are drawn on a Brandon Woods' checking account, which checking account was not opened until January 14, 1983. The $24,000 check to Agreco and the $132,000 accrued R & D deduction are attributable to the Invention Development Contract.[17]
 
 
 33
 Petitioner husband was apportioned 47.11 percent of the long term capital gain, $4,711, and 47.11 percent of the "other deductions," $83,048. Petitioners' 1982 Income Tax Return does not reflect an $83,048 deduction, but does reflect a $119,774 deduction attributable to a trust.[18] The record does not contain the 1982 fiduciary income tax return for the trust to which such deduction is attributable.
 
 
 34
 On September 8, 1986, petitioners filed an amended tax return for their 1982 taxable year which, among other things, increased their taxable income by $83,048 with the following explanation:
 
 
 35
 While taxpayers disagree with the Internal Revenue Service's determination of a total disallowance of taxpayers' share of the 1982 loss from Brandon Woods Associates, taxpayers are increasing taxable income by same, intending to file a claim for refund for same.
 
 
 36
 One day later, on September 9, 1986, petitioners filed another amended tax return for their 1982 taxable year decreasing their taxable income by $83,048 with the following explanation:
 
 
 37
 Taxpayers are entitled to a loss of $83,048 from Brandon Woods Associates. While such loss was claimed on the original return, a form 1040X was filed on 9/8/86, consistent with the examining agent's report, increasing taxable income by the $83,048.
 
 
 38
 Since the agent was in error, this form 1040X is being filed to reclaim the $83,048 loss sustained in the taxable year.
 
 
 39
 Though not otherwise evident, it appears from the amended tax returns that petitioner husband's $83,048 share of Brandon Woods' 1982 loss was claimed on petitioners' original 1982 tax return as part of the $119,774 trust deduction.
 
 
 40
 For the tax year ending January 31, 1983, petitioner husband operated his law practice through a subchapter S corporation. Petitioners' claimed 1983 net operating loss in the amount of $69,835 is comprised of, in part, a $14,839 net loss of such corporation for such year. This $14,839 loss is in turn comprised of, in part, a $57,009 legal fee deduction and a $10,247 travel deduction. Respondent has conceded all issues relating to the composition of the subchapter S corporate loss, save for the legal fee deduction and the travel deduction. Petitioners offered no evidence at trial with respect to these deductions. Records which petitioners claim were necessary to substantiate these two deductions were in respondent's possession until four days before trial, at which time they were turned over to petitioners.[19]
 
 
 41
 .............................................................
 
 
 42
 ...................[20]
 
 
 43
 * * *
 
 OPINION
 
 44
 As stated earlier, the only deductions generated from [the BKKK partnerships] which the Court will consider in this case are the deductions reported by Brandon Woods for its taxable year 1982. See text at n. 3, supra. These deductions are allowable if, inter alia, they were paid or incurred in carrying on or in connection with a trade or business. Secs. 162 and 174. Accordingly, we must determine whether Brandon Woods paid or incurred the deductions in carrying on or in connection with a trade or business.
 
 
 45
 In Green v. Commissioner, 83 T.C. 667 (1984), we disallowed deductions claimed by a limited partnership ("LaSala") for amounts paid or accrued for R & D because such amounts were not paid or accrued in connection with a trade or business. Recognizing the relaxed trade or business standard required to support section 174 R & D deductions, see Snow v. Commissioner, 416 U.S. 500 (1974), we held that LaSala was not engaged in a trade or business during the years there at issue nor was it to engage in a trade or business thereafter. Green v. Commissioner, supra at 686-687. In so holding that LaSala neither was engaged nor was to engage in a trade or business, we considered the following factors: (1) business history of the partnership and the general partner; (2) the extent of the partnership's activities after organization; (3) the partnership's ownership interest in the inventions; and (4) the extent to which the partnership was able to control the research and development. We will apply these factors to determine whether Brandon Woods engaged in a trade or business during the year at issue or was to engage in a trade or business thereafter.
 
 Business History
 
 46
 Brandon Woods, though formed earlier, was reorganized in late 1982 and a new general partner, Mr. Townsend, was substituted for the old general partner. It engaged in no business prior to its reorganization. Shortly after its reorganization, it entered into all of the contracts previously described. Thus, it had no business history before entering into the transactions at issue.
 
 
 47
 Though Mr. Townsend had engaged in other business activities, his first exposure to ginseng and R & D was with respect to his involvement with Brandon Woods and the other BKKK partnerships for which he served as general partner. Mr. Townsend initially spent his time "learning the business." By the time he finished this activity, Brandon Woods, as will be seen below, was required only to perform ministerial acts, which acts were to be performed in a similar fashion irrespective of Mr. Townsend's newly acquired familiarity with ginseng and R & D. Accordingly, we hold that Mr. Townsend had no relevant business history prior to the time Brandon Woods was reduced to performing merely ministerial acts.
 
 
 48
 Partnership's Activities After Organization
 
 
 49
 After Brandon Woods' organization, it was to be in cash flow equilibrium. Its annual receipts of $448,376.20 (the $4,239.32 annual acquisition payment per LPU times 35 LPUs, $148,376.20, plus the $300,000 annual royalty payment) exceeded by only $453.74 its annual obligations of $447,922.46 (the annual development payment). In the absence of percentage royalty payments, Brandon Woods was merely required to receive checks from the LPU holders and exchange checks with Agreco, the amounts of all such checks being predetermined. In the event of percentage royalty payments, Brandon Woods was required to do no more than exchange checks, the amounts of some of which were not predetermined, though such amounts could be determined from a predetermined formula. Accordingly, and in consideration of our holding below that Brandon Woods could exercise no control over the manner in which Agreco performed its services, we hold that after Brandon Woods' organization, it was to perform only the ministerial activities of receiving and exchanging checks.
 
 Ownership of Inventions
 
 50
 Pursuant to the Invention Development Contract, Agreco owned the ginseng test crops. Pursuant to the Exclusive License Agreement, which agreement is nearly identical to the Green exclusive license agreement[21], Brandon Woods effectively sold all its interest in the MISC system to Agreco.[22] Petitioners do not strongly contend otherwise.[23]
 
 
 51
 However, petitioners contend that Brandon Woods acquired and retained ownership of other inventions, technologies, and processes, specifically (1) agronomic technology, (2) the ginseng standardization process, (3) the hydro-growth carts invention, (4) the electric locks invention, and (5) the plastic molding process for trays.[24] Under our reading of the Exclusive License Agreement, the scope of which is quite broad, all of the inventions, technologies, and processes listed above, with the possible exception of the ginseng standardization process, fall within the scope of the Exclusive License Agreement and are thus owned, not by Brandon Woods, but by Agreco. See notes 8 and 23, supra. If and to the extent such inventions, technologies, and processes do not directly fall within the scope of the Exclusive License Agreement, they are nevertheless owned by Agreco because they were retained by Agreco or were "required" to be assigned to Agreco by Agreco pursuant to the Invention Development Contract. See notes 12 and 13, supra. Accordingly, we reject petitioners' contention that Brandon Woods owned inventions, technologies, or processes.[25]
 
 Control
 
 52
 Neither the Invention Development Contract, nor any other contract between Agreco and Brandon Woods, gave Brandon Woods any control over the manner in which Agreco was to perform its services. In fact the Invention Development Contract is replete with phrases describing activities Agreco may engage in at its sole discretion.
 
 
 53
 Petitioners argue that Brandon Woods effectively had control over Agreco because Brandon Woods could refuse to make the annual development payments if Agreco refused to submit to Brandon Woods' control. This element of control, however, is more illusory than real. If Brandon Woods refused to make an annual development payment, Agreco could refuse to make the annual royalty payment and could refuse to continue providing services. Agreco in fact followed this course of action in 1985 when Brandon Woods was unable to make in full its ... annual development payment.[26] Further, the Invention Development Contract specifically makes payment of the annual development payment not contingent upon the results of Agreco's services. See n. 11, supra. Accordingly, withholding payment of the annual development payment does not represent a source of control exercisable by Brandon Woods.
 
 
 54
 Petitioners also argue that the supervisory services performed by Mr. Townsend and petitioner husband indicate that Brandon Woods controlled Agreco in the performance of Agreco's services. However, in the absence of a contractual right to control the performance of Agreco's services, the extent of supervision over such services is not material in deciding whether Brandon Woods engaged in or was to engage in a trade or business. See Green v. Commissioner, supra at 690.[27]
 
 
 55
 Accordingly, we hold that Brandon Woods could not exercise control over Agreco in the performance of Agreco's services for Brandon Woods.
 
 
 56
 Pursuant to Green v. Commissioner, supra, and the foregoing analysis, we hold that Brandon Woods was not engaged in a trade or business during the year at issue and was not to engage in a trade or business thereafter. Accordingly, its claimed deductions are not allowable under section 162 or section 174.
 
 
 57
 .............................................................
 
 
 58
 ...................[28]
 
 
 59
 * * *
 
 
 60
 In light of the foregoing, we hold that petitioners are not entitled to any deductions attributable to Brandon Woods' 1982 taxable year.[29] Further, pursuant to the parties' agreement, see text at note 3, supra, petitioners are not entitled to any deductions attributable to the other BKKK partnerships' 1982 taxable years.
 
 
 61
 The next issue is whether petitioners have satisfied their burden of proof with respect to the subchapter S corporate law practice deductions. Petitioners, who presented no evidence on this issue at trial, apparently argue that they should be relieved of their burden of proof on this issue because they received back from respondent records, purportedly necessary to substantiate the two deductions, with insufficient time to prepare for trial. Petitioners' argument must fail because the Court finds that petitioners received the records with sufficient time before trial to be able to prove at trial that the two deductions were proper.[30] Petitioner did not so prove. Accordingly, the legal fee deduction and the travel deduction are disallowed.[31]
 
 
 62
 .............................................................
 
 
 63
 ...................
 
 
 64
 * * *
 
 
 65
 To reflect the foregoing and concessions made by the parties,
 
 
 66
 Decision will be entered under Rule 155.
 
 
 
 *
 Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 Goulding also organized or served as tax counsel for three other limited partnerships at issue in this case. The structure and activities of each of these other partnerships were similar to those of Brandon Woods, and by the parties' agreement the Tax Court trial focused only on Brandon Woods, with the result reached by the court concerning Brandon Woods applying to the other three partnerships. (Goulding challenges whether he actually agreed to use Brandon Woods as the "test case" partnership. We will discuss that issue further in section II of this order.)
 
 
 [2]
 In his reply brief, Goulding purports to state a claim that the Tax Court judge should have recused himself under 28 U.S.C. Sec. 455(a) on the grounds that the judge's "impartiality might reasonably be questioned." Any claim under Sec. 455(a) is not properly before us on appeal; "the only route by which claims under Sec. 455(a) may be reviewed in this circuit" is by writ of mandamus. In re Mason, 916 F.2d 384 (7th Cir.1990). The only question before us is the question of actual bias
 
 
 [3]
 In the Tax Court, the Gouldings had argued that Robyn Goulding was entitled to innocent spouse treatment under 26 U.S.C. Sec. 6013(e). The Tax Court held she was not and the Gouldings have not raised this issue on appeal
 
 
 [1]
 Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure
 
 
 [2]
 Some partnerships utilized large patent depreciation deductions instead of or in addition to research and development deductions
 
 
 [3]
 See sec. 6221 et seq., and Maxwell v. Commissioner, 87 T.C. 783 (1986)
 
 
 [4]
 Actually, a grantor trust, of which petitioner husband is a beneficiary, was the original limited partner. For ease of reference, we will treat ownership interests owned by such trust as owned by petitioner husband
 
 
 [5]
 The trust of which petitioner husband was a beneficiary purchased .8 of the LPUs sold in 1982. See n. 4, supra. Fractions of the LPUs could be and were sold
 
 
 [6]
 Brandon Woods was structured as follows: the general partner owned 1 percent of Brandon Woods and the limited partners owned the remaining 99 percent of Brandon Woods. One percent of the portion of Brandon Woods owned by the limited partners was allocated to the original limited partner, with the remainder allocated to the other limited partners according to their ownership percentage of the LPUs outstanding
 
 
 [7]
 In March of 1985, Rodney Wolf assigned, under similar terms, three other inventions to Brandon Woods, which inventions were described as follows: hydro-growth carts, electric locks, and plastic molding process for trays. The hydro-growth carts are closely related to the MISC system
 
 
 [8]
 The Exclusive License Agreement covered:
 all substantial worldwide rights, including but not limited to the right to sublicense, enjoy, manufacture, use and sell the [MISC system], as well as the following:
 * * *
 (b) all inventions, improvements, patent applications, or patents including divisions and reissues which [Brandon Woods] now owns or controls or shall hereafter own or control relating to the subject matter of this agreement, subject to the provisions of this assignment agreement. [Emphasis added.]
 * * *
 Since the "subject matter" of the Exclusive License Agreement includes test crops of ginseng to be grown by Agreco, paragraph "b" above is not limited to only the MISC system, but also relates to agronomic improvements and technology related to the test crops. Accordingly, the ginseng agronomic improvements and technology fall within the scope of the Exclusive License Agreement.
 
 
 [9]
 The percentage royalty was to be reduced to fifty percent once $10,000,000 in royalties were paid. Further, the $10,000 minimum royalty, but not the $300,000 annual royalty payments, would reduce the amount otherwise due pursuant to the percentage royalty
 
 
 [10]
 A document entitled "Research Proposal," apparently prepared by Agreco and submitted to Brandon Woods, ostensibly outlines work to be performed by Agreco for Brandon Woods, including the growing of 51 acres of ginseng test crops, and lists as a price therefor $3,495,000, the exact amount payable by Brandon Woods to Agreco pursuant to the Invention Development Contract. However, the Invention Development Contract, which makes no reference to the Research Proposal, states that Agreco will assist Brandon Woods in performance of services outlined in section IV of the Private Placement Memorandum and "will furnish all required equipment, supplies and other personal property, including the seed and covering to plant no less than 20 acres of ginseng * * *." Section IV of the Private Placement Memorandum indicates that only 20 acres of cultivated ginseng would be grown. Further, in a document utilized to sell LPUs, only 20 acres were used to illustrate potential royalties. In consideration of the foregoing, particularly the statement in the Invention Development Contract that Agreco was to plant "no less than 20 acres," we find as a fact that Agreco was not required to plant more than 20 acres of ginseng test crop
 
 
 [11]
 The Invention Development Contract contains several statements describing what Agreco may do at its sole discretion and at one point states:
 "[the annual development payments] shall not be contingent upon the result of the services to be performed hereunder or any other event or circumstances, whatever, and shall be payable in all events, fixed and determinable in all respects."
 
 
 [12]
 The Invention Development Contract as originally drafted contemplated that Brandon Woods would retain ownership of "experimental models or prototypes," which would include MISC system prototypes and arguably would include ginseng test crops. However, this provision was scratched through and thus deleted from the Invention Development Contract. Further, the Private Placement Memorandum makes it clear that Brandon Woods would not own the MISC system prototypes and ginseng test crops as it stated: "[Brandon Woods] shall have no ownership interest in the prototypes or in the test crop."
 
 
 [13]
 Below are relevant portions of the Invention Development Contract:
 
 
 [7]
 Disclosure of Inventions. [Agreco] shall promptly make a complete disclosure in writing to [Brandon Woods] of each invention, discovery, modification or improvement, whether patentable or not (hereinafter referred to as "Invention" of 'Inventions"), conceived or actually reduced to practice, either directly or indirectly by [Agreco] acting separately or jointly with [Brandon Woods], [Brandon Woods'] customers or others during the term of this Agreement and in performance of services hereunder; except, however, to the exclusion of any invention, discovery, modification or improvement relating or pertaining to services performed for any other client of [Agreco] or upon anyone else's behalf in which [Agreco] should feel in its sole discretion it would be violative of the confidentiality of such other person. * * * However, in the event that the [MISC system] shall at any time become the subject of an exclusive license agreement or an assignment by [Brandon Woods], then any disclosure or other obligations required of [Agreco] to [Brandon Woods], as required by this Agreement, shall be due instead to such licensee or assignee of [Brandon Woods]
 
 
 [8]
 Patents and Copyrights. [Agreco] shall, upon [Brandon Woods'] request, assign to it, its successors and assigns, any such Invention * * *
 Agreco had entered into similar invention development contracts with two of the other BKKK partnerships under which it was obligated to perform for such other partnerships all of the services, save for the development of the MISC system, which it was required to perform for Brandon Woods pursuant to the Invention Development Contract. Accordingly, to the extent any of Agreco's services pursuant to the Invention Development Contract, except services relating to the MISC system, gave rise to an "invention, discovery, modification, or improvement," Agreco in its sole discretion could withhold disclosure and assignment to Brandon Woods. Further, since Brandon Woods exclusively licensed the MISC system to Agreco, Agreco would be "required" to disclose and assign any "invention, discovery, modification, or improvement" to itself.
 
 
 [14]
 Excepted from the services contract obligation were, inter alia, research and experimentation expenses incurred prior to January 1, 1984, and royalty payments made pursuant to the Exclusive License Agreement
 
 
 [15]
 Some consultants contracted directly with and were paid directly by Brandon Woods. However, their activities were controlled by Agreco and/or Mr. Zech. Such consultants are considered by the Court to have directly performed services for Agreco and/or Mr. Zech, not for Brandon Woods
 
 
 [16]
 As will be seen below, the BKKK partnerships were severely impaired in early 1985. From that point forward, Mr. Townsend's interests became antagonistic to those of petitioner husband's and Mr. Zech's
 
 
 [17]
 Brandon Woods' 1983 return reported $2,592,725 accrued R & D deductions and $746,000 cash R & D deductions attributable to the Invention Development Contract
 
 
 [18]
 See n. 4, supra
 
 
 [19]
 This case, like Foster v. Commissioner, 80 T.C. 34 (1983), involves a great measure of complexity. We there stated, which statement is equally applicable here:
 [The case's] complexity is reflected in the sheer magnitude of the record and is exacerbated by the contentiousness of the parties. Not surprisingly, our task of finding the facts has been laborious and frequently frustrating. We have plodded through nearly [1,500] pages of testimony and examined more than exhibits. The record is replete with factual inconsistencies and contradictions which the parties exploit to their own advantage in almost pages of briefs. Nevertheless, we have done our best to reconcile the conflicting portions of the record. In all too many instances, however, we have reluctantly concluded that perfect harmony is simply not attainable.
 Foster v. Commissioner, supra at 117.
 
 
 [20]
 [Footnote 20 deleted.]
 
 
 [21]
 The similarity is not surprising. Petitioner husband served as tax counsel for both Brandon Woods and LaSala
 
 
 [22]
 The Exclusive License Agreement, which unequivocally conveyed to Agreco all of Brandon Woods' substantial rights in the MISC system and the agronomic improvements and technology, effectuated a sale of such items. See Green v. Commissioner, 83 T.C. 667, 679-680 (1984)
 
 
 [23]
 Petitioners argue that the Exclusive License Agreement "is limited in scope to the MISC system." If this were true, Brandon Woods would not be entitled to a percentage royalty with respect to the ginseng test crops and would clearly lack a profit potential. Petitioners are mistaken as to the scope of the Invention Development Contract
 Petitioners also argue that since the Invention Development Contract was executed December 31, 1982, and the Exclusive License Agreement was not executed until January 14, 1983, Brandon Woods owned the MISC system on December 31, 1982. Since we consider execution of the Invention Development Contract and the Exclusive License Agreement as mere steps in a preconceived plan, see Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613 (1938), we draw no importance from the fact that the contracts were executed on different dates. Were we to draw any conclusion from the execution dates of the contracts, we would conclude that Brandon Woods had no profit potential in 1982 because it then had no right to receive royalties from the ginseng test crops, though it was obligated to pay the costs of growing such crops.
 
 
 [24]
 The hydro-growth carts invention is directly related to the MISC system. Petitioners have failed to prove that the electric locks invention and the plastic molding process for trays are not related aid the MISC system. Accordingly, all fall within the scope of the Exclusive License Agreement. Further, since the assignment of these inventions did not occur until after the IRS audit of Brandon Woods began, the bona fides of the assignment and the inventions is dubious
 
 
 [25]
 Further, if and to the extent Brandon Woods did own inventions, technologies, or processes not transferred to or retained by Agreco, petitioners have failed to prove that Brandon Woods was or could ever be engaged in a trade or business with respect thereto
 
 
 [26]
 In addition, Agreco sold the Agreco farm and assigned the growing ginseng without reserving Brandon Woods' rights therein, thereby compromising Brandon Woods' right to receive royalties from such ginseng
 
 
 [27]
 Petitioners also argue that Brandon Woods controlled the services performed by its own "research staff." We have, however, found as a fact that the consultants, which ostensibly constituted Brandon Woods' "research staff", are considered to have performed services directly for Agreco and/or Mr. Zech as opposed to Brandon Woods. See n. 15, supra
 
 
 [28]
 [Footnote deleted.]
 
 
 [29]
 Our conclusion in this regard obviates consideration of other arguments raised by respondent as to why Brandon Woods' claimed deductions should not be allowed
 
 
 [30]
 Petitioners, as the beneficiaries of respondent's generous concession of nearly all issues with respect to the subchapter S corporate loss, were required to prove their entitlement to only the legal fees deduction and travel deduction. Both deductions being substantial and representative of noteworthy expenditures, one would expect petitioner husband to be able to testify from memory as to their nature and to easily substantiate them with the returned records. Petitioners made no effort in these regards. Had such an effort been made, four days would have been sufficient
 
 
 [31]
 We have previously held that a taxpayer's burden of going forward with the evidence does not shift merely because his or her records were unintentionally lost by respondent; rather, the type of evidence that may be offered to establish a fact is altered. American Police & Fire Foundation v. Commissioner, 81 T.C. 699, 706-707 (1983)