**Burton L. SPELLMAN and Roslyn Spellman, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 87–2177.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1988.

Decided April 21, 1988.

---

Bernard Wiczer, Wiczer & Associates, Chicago, Ill., for petitioners-appellants.

Gary D. Gray, Appellate Sec., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and PELL, Senior Circuit Judge.

POSNER, Circuit Judge.

Since 1954 a taxpayer has been allowed to deduct from his income, as a current expense, "research or experimental expenditures which are paid or incurred ... during the taxable year in connection with his trade or business." 26 U.S.C. § 174(a)(1). This exceptional treatment—exceptional because research and development expenditures are capital in nature, since they yield benefits over a period of time rather than when incurred—may reflect the fact that such expenditures create what economists call "external benefits." These are benefits that the producer cannot capture in the prices that he charges for the goods or services that he sells. Information, including an idea for a new product or process, is an example of a valuable product the producer of which often cannot reap the benefits, because information once created is easy to appropriate by competitors. Sometimes an inventor can capture the full social benefits of his inventive activity by patenting his inventions, but often not, since patent protection is limited in duration, costly, and uncertain. So there is an argument for giving such activity preferential tax treatment, though whether or not that is the reason behind section 174(a)(1) is speculative at best.

At first the Internal Revenue Service interpreted the statute to mean that the taxpayer must already be engaged in a trade or business (hereinafter just "business") in order to be allowed to take the deduction, but the Supreme Court disagreed and allowed the investor in a partnership formed to develop a new product to deduct his pro rata share of the partnership's research and development expenses. *Snow v. Commissioner*, 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974). As a result, an expenditure can qualify for immediate deductibility even if it is in connection with a business that has not yet gotten off the ground.

*Snow* makes it important to determine whether the prospects for developing a new product that will be exploited in a business of the taxpayer are realistic, and that question is the focus of this case as it was of *Levin v. Commissioner*, 832 F.2d 403 (7th Cir.1987). If those prospects are not realistic, the expenditure cannot be "in connection with" a business of the taxpayer. In *Levin*, where the partnership was formed to develop food machinery, not only was the partnership not in the food machinery business already—that would not have been critical, after *Snow*—but the actual development of the machinery was to be done by another company, which would also have the right to sell the machinery it developed. The agreement gave the part-

**150**

nership some rights to technology developed by the company; but basically, as the Tax Court found after a trial, the partnership was a passive investor. It was seeking to deduct not a development expense in connection with its own current or prospective business—its own business was and in all likelihood would remain investments—but a capital contribution to a company that was in the business of developing new products. The partnership was not likely to become a producer, and the Tax Court therefore disallowed the deduction, and we affirmed.

■ This case is similar, except that here the Tax Court did not give the taxpayers a trial but instead granted summary judgment to the Internal Revenue Service. The taxpayers, Mr. and Mrs. Spellman, are limited partners in Elmer South Oil Partnership, which is in turn a limited partner in Sci–Med, the general partner of which is an Israeli company. The agreement creating Sci–Med provided that Sci–Med would enter into a research and development agreement with Teva Pharmaceutical Industries, Israel's largest drug manufacturer and the parent of Sci–Med's general partner. Sci–Med would contribute $855,000 to enable Teva to develop new antibiotics, specifically new penicillins. Teva would have exclusive rights to make, sell, license, etc. the new penicillins. The Spellmans claim that, as a matter of custom in the industry and therefore an implied term of the contract, these rights would not vest in Teva until the products were actually developed—until then they would remain with Sci–Med. This reservation of rights would be significant if Teva went broke during the developmental period, but probably not otherwise; and while, in the event of Teva's bankruptcy, the reservation would give Sci–Med additional assets, it would no more put it in the pharmaceutical business than foreclosing on a real estate mortgage would make a bank a real estate company.

The agreement provided that Teva would pay Sci–Med 5 percent of Teva's revenues from the new penicillins, as a royalty, until Sci–Med recovered its $855,000; the royalty would then drop to 1 percent. Antibiotics developed under the agreement but not as part of the specific project to develop new penicillins—byproducts, as the parties call

them—would belong to Sci–Med, but Teva was given the right to purchase Sci–Med's rights to the byproducts for $20,000. Finally, the agreement granted Sci–Med the right to monitor Teva's research and development program in order to assure compliance with the agreement.

If Sci–Med had merely hired Teva to conduct research and development as its agent, the research and development expenditures would be Sci–Med's for purposes of the statute. See 1 Bittker, Federal Taxation of Income, Estates and Gifts ¶ 26.4.2 at p. 26–23 (1981). Even so, it would not follow that Sci–Med could deduct these expenditures under the statute if it had dealt away to Teva the right to make the products resulting from the research and development. Having contracted out both the research and development and the production and marketing, Sci–Med's involvement in the product cycle might be viewed as that of an investor rather than that of an entrepreneur (though this we need not decide), and "the management of investments is not a trade or business" for purposes of section 174. *Green v. Commissioner*, 83 T.C. 667, 688 (1984).

If on the other hand Sci–Med were merely financing Teva's R & D in exchange for royalties, there would be no possible argument for a deduction under section 174(a)(1). The $855,000 would not be an expense of Sci–Med but a capital contribution, equivalent to the purchase price of a share in an oil lease—Elmer South's original business—and of course not deductible. Compare section 1235(a) of the Internal Revenue Code, which treats royalty payments in exchange for the transfer of patent rights as capital gains. See *Hofferbert v. Briggs*, 178 F.2d 743 (4th Cir.1949). The only difference between the hypothetical case and our case is that Sci–Med had a prospect of recovering not only royalties but also byproducts, and if that happened and it decided to develop the byproducts rather than sell or license their development to another firm like Teva, it would be in the pharmaceutical business. But this prospect was remote, and not only because Sci–Med presented no evidence that it has, or is likely ever to acquire, a staff, relevant

experience, or anything else indicating a likelihood or intention of entering the business. Whatever Sci–Med's desires, Teva's option to acquire for only $20,000 all rights in the byproducts will prevent Sci–Med as a practical matter from ever entering the pharmaceutical business as a result of the venture with Teva. If the byproducts turn out to be worth more than $20,000, Teva will exercise the option and Sci–Med will have no products to make or sell; if the byproducts turn out to be worth less, Sci–Med will have the right to market them but will not exercise the right because the costs would exceed the possible profits. It would not pay Sci–Med to attempt the exploitation of rights worth at most $20,000, when to do so it would have to acquire staff, facilities, and pharmaceutical expertise, all from the ground up.

Of course, the byproducts might be worth more than $20,000 yet Teva might make a mistake and fail to exercise its option; but since Teva rather than Sci–Med is the pharmaceuticals company, this eventuality is unlikely, and certainly not so likely as to warrant treating the $855,000 as an expenditure in connection with a future business of Sci–Med. The further argument that Teva's exercise of its option would signify that Sci–Med had been engaged in the pharmaceuticals business for just long enough to watch Teva acquire the business by the exercise of the option fails for the same reason that its argument that it owned the rights to the fruits of the research program until Teva actually succeeded in developing some new penicillins failed: these arguments show at most that Sci–Med will probably acquire some rights to drug products, not that it will ever be in the drug business. Finally, the fact that Sci–Med reserved the right to monitor Teva's use of Sci–Med's money no more put Sci–Med into the pharmaceuticals business than a bond debenture entitling the debenture trustee to inspect the books and plants of the corporation issuing the bonds would make the bondholders joint venturers with the corporation. See, e.g., *Whipple v. Commissioner*, 373 U.S. 193, 202–03, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963);

*Green v. Commissioner, supra,* 83 T.C. at 690.

The Supreme Court's interpretation of section 174(a)(1) fairly invited the creation of R & D tax shelters, and the bar quickly took up the invitation. See, e.g., Moore, Ayers & Pope, *How Limited Partnerships Tax-Shelter the R & D of New Products or Technology,* 49 J. Taxation 138 (1978); Martin & Thompson, *Planning for the R & D Tax Shelter: An Analysis of the Essential Tax Elements,* 53 J. Taxation 204 (1980); Grenier, *Structuring the R & D Partnership: An Overview,* 87 Commercial L.J. 630 (1982); Goff, *Research and Development Tax Shelter Partnerships,* 11 Colo. Lawyer 1851 (1982). The nature of the invitation is well illustrated by this case. Elmer South claimed the right to flow through a largely future expenditure (for Sci–Med was to pay the $855,000 to Teva over time) at once to its cash-basis individual limited partners (the Spellmans and others), who could use it to offset unrelated taxable income and thus obtain a tax benefit years ahead of any royalties. Compare *Rosenberg v. Commissioner,* 54 T.C.M. 392, 401 and n. 25 (1987). The plan might have worked if Sci–Med had had good prospects of entering the pharmaceuticals business, but, as we have been at pains to stress, it did not, and so clear is this that a trial was not required. No other inference is possible than that the provision entitling Sci–Med to develop the byproducts if (but only if) Teva didn't exercise its option was inserted only to create a colorable claim to deductibility under section 174(a)(1).

The Spellmans argue that the case is "overflowing" with factual issues; this it may be, but the question is whether these factual issues, if resolved in the Spellmans' favor, would show that they were entitled to a deduction. If, when discovery is completed, the party with the burden of proof has failed to obtain enough evidence to defeat (if it were a trial) a motion for directed verdict, his opponent is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Barker v. Henderson, Franklin, Starnes & Holt,* 797

F.2d 490, 496 (7th Cir.1986). The cases we have cited were decided under Rule 56 of the Federal Rules of Civil Procedure, and the Tax Court has its own rules, but the pertinent language in the Tax Court's summary-judgment rule ("that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law") is materially identical to that of Rule 56. Compare Fed.R.Civ.P. 56(c) with Tax Ct.R. 121(b). When it is plain that a trial could have but one outcome, summary judgment is properly granted to spare the parties and the court the time, the bother, the expense, the tedium, the pain, and the uncertainties of trial.

AFFIRMED.