United States Court of Appeals,

Fifth Circuit.

No. 92-5097.

Joseph R. HARRIS, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

March 10, 1994.

Appeal from a Decision of the United States Tax Court.

Before POLITZ, Chief Judge, REYNALDO G. GARZA, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The taxpayer appeals from the Tax Court's denial of his deduction of his distributive share of payments made by his partnership to a corporation as a research and development expense under 26 U.S.C. § 174(a)(1). Because we find the partnership did not pay for research and development "in connection with" its own trade or business, we affirm the Tax Court.

I

In 1981, Jake Bauer and Howard Leith carried out a plan to attract capital for continued funding of their research and development of cementitious composites for use as tooling in the aerospace industry and of glass-reinforced cement for use in a substitute for wood in shipping pallets. First, Bauer and Leith formed CemCom Research Associates, Inc. ("CemCom") to own the technology and conduct research. Bauer and Leith anticipated that CemCom would license the finalized technology to other entities that would manufacture and sell the resulting cement products.

1

Second, the two men retained an investment advisor, Mr. Townsend, to form Research One Limited Partnership (the "Partnership") to attract capital by selling limited partnership interests to the public. Third, the Partnership executed a Research and Development Agreement (the "R & D Agreement") under which the Partnership contracted out all of the research work to CemCom. The R & D Agreement provided that all property rights arising from CemCom's research would vest in the Partnership, and the Partnership would pay installments totalling $5,050,000 to CemCom for the research services. Fourth, the Partnership and CemCom executed a Technology Transfer Agreement (the "Transfer Agreement") under which CemCom received the option of obtaining a perpetual exclusive license of the resulting technology. CemCom would have to pay substantial royalties to the Partnership if it exercised the option. If it did not exercise the option, however, CemCom, Bauer, and Leith could not engage in any research, development, or business activity involving the cement technology for a period of five years.

Under the R & D Agreement, the first two installments payable to CemCom, totalling $2,250,000, would be funded with capital paid into the Partnership by the partners. The final installment of $2,800,000 would be paid over an eight-year period beginning in 1984. The investment prospectus indicated that the promoters anticipated the final installment to be offset by royalties paid by CemCom to the Partnership after the exercise of the licensing option. In the event these royalties were insufficient to provide additional research funds to CemCom, the limited partners would be

personally liable for their proportionate share of the final installment. Townsend told potential limited partners that although it was not highly probable that CemCom would exercise its current option with high royalty payments, it was highly probable that CemCom would renegotiate the licensing option to provide for lower royalty payments.

When the research and development did not produce results as quickly as hoped, Mr. Townsend became involved in assisting CemCom in negotiating sublicensing agreements with third parties and in obtaining capital from outside sources. In September 1984, CemCom negotiated a new licensing agreement with the Partnership that provided for royalty payments that were lower than those projected in the original option, but were still sufficient to avoid requiring the limited partners to fund the third installment under the R & D Agreement. Between 1984 and 1986, the Partnership, as CemCom's assignee, received six patents on the cement technology. In March 1986, CemCom granted an exclusive sublicense to a chemical company to commercialize all of CemCom's technology and products for twenty-five years.[1] Four months later, the Partnership

---

[1]On page 24 of his brief, Harris states:

> Eventually, the Partnership did license the patented technology, after further arm's length negotiations. In the interim, CemCom's option had expired.

The record (Volume II, Exhibit 46-AT), however, shows that it was CemCom—not the Partnership—that sublicensed the patented technology to the chemical company. Although CemCom's option to license the technology expired in March 1984 (Volume II, Ex. 39-AM), CemCom nevertheless entered into a licensing agreement with the Partnership on September 22, 1984 (Volume II, Ex. 45-AS) and, thus, had the exclusive

renegotiated its licensing agreement with CemCom to provide for lower minimum royalty payments, but higher maximum royalty payments.

In 1981, the Partnership accrued a deduction of $5,050,000 for research expenses under section 174(a)(1) of the Internal Revenue Code. As a limited partner, Mr. Harris deducted his distributive share of this amount, and the Commissioner disallowed the deduction.

## II

The Tax Court agreed with the Commissioner and disallowed the deduction because it held that the Partnership did not expend the funds "in connection with [its] trade or business." Specifically, the Tax Court held that there was no "realistic prospect" that the Partnership would develop and exploit the cement technology, through manufacture of a product or licensing of technology, in a trade or business of its own. Instead, the Partnership was a passive investment vehicle. The Tax Court also found that the transfer of the cement technology to CemCom via the licensing agreement did not constitute a trade or business of the Partnership. Further, the Tax Court held that the clause in the R & D Agreement that stated that CemCom undertook the research activities "on behalf" of the Partnership did not attribute the trade or business of CemCom to the Partnership.

## III

### A

---

rights to sublicense the technology in the marketplace.

Before the enactment of section 174, the treatment of research expenditures depended on whether the taxpayer incurring the expenses was an ongoing business or a start-up business. Ongoing businesses could deduct research expenditures as ordinary and necessary expenses incurred in "carrying on a trade or business." *See* 26 U.S.C. § 162 (1988). Start-up companies, however, were prevented from deducting research expenses by the general rule that companies that had not yet begun business could not deduct expenses because they did not incur the expenses in "carrying on" a trade or business.[2] Accordingly, start-up companies had to capitalize these expenditures and their future ability to recover the costs depended on the ultimate and sometimes unpredictable results of the research. If the research effort was ultimately unsuccessful, the start-up company could deduct the cost incurred as an abandonment loss.[3] If the expenditures were successful and produced a result that had a determinable useful life, such as a patent, the start-up company could amortize the cost over the relevant useful life.[4] If

---

[2]Professor Willis states:

> A principle of federal tax law that is axiomatic is that costs incurred by a taxpayer prior to entering into a business are not deductible currently. Although disagreements may exist over whether business in fact has begun, there no longer are viable grounds for challenging the basic legal principle.

Willis, et al., *Partnership Taxation* § 41.08, p. 41-13 (4th ed. 1993).

[3]S.Rep. No. 1622, 83d Cong., 2d Sess. 1, 33 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4621, 4663.

[4]*Id.* at 33, 1954 U.S.C.C.A.N. at 4663.

the successful effort produced a result without a determinable useful life, the start-up company had no means of recovering the cost of research results short of selling the project *in toto* to a third party.[5]

In designing section 174, Congress intended to: (1) eliminate the tax treatment uncertainty faced by start-up companies beginning a research project where they could not anticipate whether their efforts would result in patentable or nonpatentable results; and (2) encourage research and experimentation.[6] To this end, Congress mollified the harsh effects of section 162's beginning business requirement by drafting section 174 to allow a deduction of research expenditures incurred "in connection with," instead of in "carrying on," a trade or business language. Section 174(a)(1) provides:

> A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year *in connection with his trade or business* as expenses which are not chargeable to [the] capital account. The expenditures so treated shall be allowed as a deduction.

(Emphasis added).

There has since been one Supreme Court case interpreting this section. In *Snow v. Commissioner,* 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974), the Supreme Court allowed a partnership to deduct research expenses under section 174 for the development of an incinerator even though the device had not been marketed at the end of the relevant tax year. The Court viewed section 174's "in

---

[5]*Id.* at 33, 1954 U.S.C.C.A.N. at 4664.

[6]*Id.*

connection with" language—unlike section 162's "carrying on" language—as allowing the partnership to deduct the research expenses even though the expenditures were connected with a future business of the partnership rather than its current business. *Id.* at 504, 94 S.Ct. at 1878-79.

B

Although *Snow* settled that the temporal nexus of a research project to the start of an active trade or business was not dispositive of section 174's applicability, it left open the degree of "connection" required between the expenditures and the operation of the trade or business itself—the operational nexus—in order to trigger section 174's exception to the general rule of nondeductibility of pre-operation expenditures. In analyzing the operational nexus facet of section 174, the courts have dealt with a broad spectrum of financial arrangements. At one end of the spectrum lie arrangements in which a partnership buys stock in a corporation, which then uses the capital to fund research activities, manages the research activities itself, manufactures the resulting product, sells the product in the marketplace, and returns a portion of the profits to the partnership as dividends. In these situations, the partnership does not incur research expenses in connection with its trade or business but, instead, functions as an investment vehicle that cannot deduct the cash paid to the corporation under section 174 even if the corporation used that very cash to fund its research expenditures. At the other end of the spectrum lie financial arrangements in which a partnership

uses its own funds to conduct research activities, manufactures the product itself, and sells that product in the marketplace. In this instance, the partnership incurs research and development expenditures in connection with its trade or business and can deduct them under section 174. It is between these clearly defined ends of the spectrum that the cases that guide our decision today lie.

In *Snow,* 416 U.S. at 502, 94 S.Ct. at 1878, the partnership actually conducted research activities. The general partner was an inventor and devoted a significant amount of time to the research and development of the incinerator. *Id.* at 502, 94 S.Ct. at 1877-78. The partnership also contracted out some of the research work to an engineering firm. *Id.* at 502, 94 S.Ct. at 1878. Eventually, the research was successful, the partnership incorporated and sold the incinerators to the public. *Id.* at 502 & n. 3, 94 S.Ct. at 1878 & n. 3. Thus, the partnership incurred the research expenditures "in connection with" its trade or business of developing, manufacturing, and selling incinerators, and the court allowed the section 174 deduction. *Id.* at 504, 94 S.Ct. at 1879.

In *Smith v. Commissioner,* 937 F.2d 1089, 1091 (6th Cir.1991), the partnership obtained a license to use certain energy technology. In order to construct and operate an energy plant, the partnership contracted out all the research and the construction oversight to an outside research firm. *Id.* After the plant was completed, however, the partnership owned, operated, and managed the plant to produce "synthetic fuel for marketing purposes." *Id.*

Because, the research fees paid to the outside firm were "in connection with" the partnership's trade or business of developing, owning, and operating an energy plant, and section 174 applied to allow the deduction of research expenses. *Id.* at 1097-98.

In *Zink v. United States,* 929 F.2d 1015, 1017 (5th Cir.1991), this court dealt with a financial arrangement in which individuals owned plans for component airplane parts instead of partnership interests. The taxpayers contracted out both the research work and the manufacturing and marketing activities. Under the relevant agreements, the individuals paid cash to an aircraft design company to conduct the research on the airplane parts. *Id.* at 1017. Although the individuals would own the resulting plans, these plans had no market value because they were only for the components of an overall design. *Id.* Further, as part of the initial agreements, the individuals immediately licensed the right to use, sublicense, and otherwise exploit the results of the research. *Id.* Thus, there was no "realistic prospect" that the investors who admittedly knew nothing about the airplane business would ever engage in developing or marketing airplanes or airplane parts. *Id.* at 1022-23. Accordingly, we denied the deduction under section 174. *Id.* at 1023.

*Spellman v. Commissioner,* 845 F.2d 148 (7th Cir.1988) (Posner, J.), is illustrative of cases the circuit courts have dealt with in which a partnership did not immediately grant a license to the research company to manufacture and market the results of the research, but in which the economic realities of the arrangement

9

insured that the partnership would grant such a license instead of exploiting the research results itself.[7] In *Spellman,* 845 F.2d at 150, a limited partnership paid a pharmaceutical company to engage in research to develop penicillins and granted the pharmaceutical company the exclusive right to "make, sell, license, etc." the new penicillins and the option to purchase any byproducts of the research for a small fee. The court found that there was no realistic prospect that the partnership would engage in the business of manufacturing or marketing the penicillins because, despite the partnership's claimed reversionary rights to the penicillins, it was not prepared to exploit the drugs itself. *Id.* Furthermore, even though the partnership had the rights to the byproducts of the research, the fact that the pharmaceutical company could purchase the rights to exploit the research byproducts for a small fee dimmed the prospects that the partnership itself would manufacture or market the byproducts. *Id.* at 150-51. Thus, the court affirmed the Tax Court's grant of summary judgment denying deductibility under section 174 because there was no realistic prospect the results of the expenditures would be used "in connection with" the partnership's trade or

---

[7]*See Kantor v. Commissioner,* 998 F.2d 1514 (9th Cir.1993) (denying section 174 deduction where partnership contracted all software research out to research corporation and, although the partnership would "own" the resulting software, the corporation had a low-cost option to market the resulting software); *Diamond v. Commissioner,* 930 F.2d 372 (4th Cir.1991) (denying section 174 deduction to partnership where the economic reality was that a research corporation would perform all robotics research and, although the partnership would "own" the results of the research, the corporation had a no-cost option to manufacture and market the results of that research).

business.  *Id.* at 149, 151-52.

C

As with the courts before us, we must sift through research and development agreements, technology transfer agreements, options, licenses, etc., in order to ascertain whether the economic realities of the financial arrangement in this case warrant allowance of the section 174 deduction.[8]  All of the above cases—both those allowing and disallowing the section 174 deduction—involved a profit motive.  *See, e.g., Zink,* 929 F.2d at 1021 (stating that section 174's trade or business requirement necessitates a profit motive).  Consequently, the mere presence of a profit motive in the financial arrangement here is not determinative of whether the section 174 deduction will be allowed. In our view, those cases in which a section 174 deduction was upheld may be distinguished by one dispositive factor:  In each of the cases allowing the deduction, the entity that incurred the research expenses actually managed and actually controlled the use or marketing of the research results.  The question here is whether the Tax Court was clearly erroneous in finding the nexus of those activities was to CemCom instead of the Partnership.[9]

---

[8]As the Seventh Circuit noted in *Spellman,* 845 F.2d at 151, "[T]he Supreme Court's interpretation of section 174(a)(1) fairly invited the creation of R & D tax shelters, and the bar quickly took up the invitation."  The financial arrangement in the instant case evidences an unusual degree of sophistication in attempting to secure the benefits of section 174 for the limited partner-investors.

[9]Harris also argues that the application of post-1981 case law—essentially post-*Snow* cases—to this case constitutes an unjustified retroactive application of a new rule in a civil

11

IV

A

On appeal, Harris focuses his argument on the marketing of the research results.[10] He contends that the Partnership was in the trade or business of licensing—marketing the right to use—the cement technology that CemCom developed. *See Louw v. Commissioner,* 30 T.C.M. (CCH) 1421 (1971) (holding that the exploitation of inventions through royalties, sales of patents, or otherwise may constitute a business). Harris points out that the Partnership did in fact obtain patents, as CemCom's assignee. Harris argues that the Partnership had a realistic prospect of licensing those patents in either of two ways. First, because of the very high royalty expenses CemCom would incur if it exercised the option to license the patents back from the Partnership—in contrast to the small fee to license the research results that the research company was confronted with in *Spellman,* 845 F.2d at 150-51—there was a

case. This contention is meritless. As previously discussed, *Snow* dealt with the temporal nexus to a trade of business. The post-*Snow* cases that have dealt with the operational nexus requirement of section 174, in effect, interpret the pre-1981 "in connection with" language using the economic realities, or substance over form, doctrine. This doctrine also predates 1981. *See Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) (holding that a transaction, although qualifying in form, failed to qualify in substance as a reorganization because "[t]o hold otherwise would be to exalt artifice above reality ..."). Accordingly, the post-*Snow* cases did not develop or apply a new rule.

[10]This approach is Harris's only claim to the deduction because CemCom performed all of the research and development activities without significant oversight by the Partnership. Further, evidence showed that the Partnership was interested in "results only" and not the actual performance of research activities as it had no plans to hire any staff.

significant possibility that CemCom would not license the technology and, thus, the Partnership would have to license it in the marketplace. Second, even if the Partnership did plan only to license the patents to CemCom, the licensing of those patents alone would constitute the trade or business of licensing the technology.

The Partnership did in fact license those patents to CemCom, and the Partnership's general partner, Townsend, helped CemCom in negotiating the ultimate sublicense to the chemical company. Thus, Harris contends, the monies that the Partnership paid CemCom to develop the patentable technology were in connection with the Partnership's trade or business of licensing that technology. The Commissioner asserts to the contrary that the Partnership was merely an investor, and that the parties always intended that CemCom would conduct all of the research and perform all of the marketing activities with third parties which, in fact, it did.

We review *de novo* the Tax Court's legal conclusions, including its interpretations of the Internal Revenue Code. *Lukens v. Commissioner,* 945 F.2d 92, 97 (5th Cir.1991). We must, however, accept the Tax Court's findings of fact unless they are clearly erroneous. *Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960). We must determine whether the Tax Court was clearly erroneous in finding that, in 1981, there was a realistic prospect that the Partnership, instead of CemCom, would engage in the licensing of the cement technology. *See Spellman,* 845 F.2d at 149.

B

13

Harris's first contention—that there was a realistic prospect that the Partnership would market the technology because CemCom would not exercise its option—fails because the economic realities of the instant financial arrangement do not support his contention. From the face of the documents, it might appear that unlike the research company in *Spellman,* 845 F.2d at 150, and similar cases where the section 174 deduction was denied, CemCom would *not* exercise its option because of the extraordinarily large royalty payments. Thus, the documents might suggest that the Partnership was going to license the technology in the marketplace itself. When we look beyond the face of the documents, however, we cannot characterize as clearly erroneous the Tax Court's finding that, in 1981, the parties actually intended to renegotiate the option at a lower level of royalty payments, which would allow CemCom to license the technology from the Partnership at a reasonable price. This intent was evidenced by the covenant not to compete agreement that would have put CemCom, Bauer, and Leith out of the cement business for five years if they did not license the technology back from the Partnership. Further, the partnership had no expertise in the cement industry and no remaining capital to fund any marketing efforts. Still further, Townsend told potential investors in the Partnership that the licensing agreement would probably be renegotiated to provide for lower royalty payments. The ultimate disposition of the technology reflects the intent the parties had in 1981: CemCom sublicensed the technology it developed to a third party, the chemical company, that paid royalties to CemCom, and

14

CemCom forwarded a portion of these royalties to the Partnership under a renegotiated licensing agreement. Thus, we hold that the Tax Court was not clearly erroneous in finding that there was no realistic prospect that the Partnership would market the technology itself.[11]

Harris's second contention—that the intended licensing of the patents to CemCom constituted the trade or business of marketing the technology—fails because the Partnership's licensing of the patents to CemCom did not possess the indicia of continuity and regularity necessary to endow an activity with trade or business status. The Partnership's prearranged license of the inventions

---

[11]The various agreements simply do not attribute CemCom's trade or business of licensing the technology to the Partnership. Although the regulations provide that another entity may perform research on behalf of the taxpayer, Treas.Reg. § 1.174-2(a)(2) (1957), they do not provide that the other entity may conduct a trade or business on behalf of the taxpayer. *See Zink*, 929 F.2d at 1022 ("[T]he mere presence of a valid business purpose at one level of a transaction does not automatically entitle passive investors distant from the day-to-day operations of the enterprise to the associated tax benefits") (internal citations omitted). As Judge Posner hypothesized in *Spellman*, 845 F.2d at 150:

> [I]t does not follow that [the partnership] could deduct these expenditures under the statute if it had dealt away to [the research company] the right to [exploit] the products resulting from the research and development. Having contracted out both the research and development and the production and marketing, [the partnership's] involvement in the product cycle might be viewed as that of an investor rather than that of an entrepreneur....

Judge Posner then stated that the remote possibility that the partnership in *Spellman* would actually exploit the byproducts was insufficient to detract from the economic realities and resulting tax effects of the above hypothetical. *Id.* at 150-51.

that resulted from CemCom's research back to CemCom was in essence a *single* prearranged deal. One prearranged deal does not evidence the continuity and regularity found in trades or businesses. *See Commissioner v. Groetzinger,* 480 U.S. 23, 35, 107 S.Ct. 980, 987, 94 L.Ed.2d 25 (1987) (stating that it has long been the law that the phrase "trade or business" involves an activity conducted "with continuity and regularity"); *Green v. Commissioner,* 83 T.C. 667, 689, 1984 WL 15626 (1984) (holding that although the regular licensing and sale of inventions can amount to a trade or business, the intent to dispose of all the inventions in one transaction, instead of regularly licensing inventions for profit, indicates that such activity did not rise to the level of a trade or business).[12] Thus, we hold that the Partnership was not in the trade or business of marketing the technology.

In sum, the operational nexus of the trade or business in this financial arrangement was to CemCom in 1981, because the economic realities clearly show that CemCom would conduct all the research activities and would market the results of those activities to

---

[12]Further, the record fully supports the view that the Partnership and Cemcom entered into the licensing transaction to allow CemCom to obtain revenue from outside third parties from which it then would pay the Partnership royalties. Indeed, CemCom itself did not have the financial resources necessary to pay the Partnership royalties; a sale to an independent third party was a necessary prerequisite to the financial success of the arrangement. This case is not similar to those cases in which a single product sold in a prearranged deal to an independent third party constituted a trade or business. *See,* e.g., *S & H, Inc. v. Commissioner,* 78 T.C. 234, 244, 1982 WL 11190 (1982) (holding that the sale of property acquired for the purpose of selling to an independent buyer in a single transaction constituted the trade or business of selling real estate).

third parties.  Thus, the research expenditures made by the Partnership were not "in connection with" *its* trade or business, and section 174 does not apply.

V

For the foregoing reasons, we AFFIRM the Tax Court's denial of Harris's deduction for research and development expenditures made in connection with the Partnership's trade or business.

AFFIRMED.