MACH-TECH, LTD. PARTNERSHIP, SERV-TECH, INC., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mach-Tech, Ltd. v. Commissioner
Docket No. 6529-92
United States Tax Court
T.C. Memo 1994-225; 1994 Tax Ct. Memo LEXIS 226; 67 T.C.M. (CCH) 2984; May 23, 1994, Filed *226 For petitioner: Larry E. Jacobs and Ruth E. Salek. For respondent: David B. Mora. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: As stipulated, the only issue for consideration is whether, pursuant to section 174, [1] Mach-Tech, Ltd. Partnership (Partnership) is "entitled * * * to elect to deduct its research and experimental expenditures." FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by reference. From December 1983 through June 1986, Partnership was a limited partnership formed under the laws of the State of Texas. When the petition was filed, Partnership no longer had a principal place of business, but the principal place of business of its general partner and tax matters partner, [2] Serv-Tech, Inc. *227 [3] (Serv-Tech), was in Houston, Texas. [4]
Serv-Tech is a corporation incorporated under the laws of the State of Texas. As of 1983, the business of Serv-Tech was industrial and chemical cleaning, plant maintenance, and oilfield services. Partnership *228 was formed to engage in the research, development, reduction to commercial use, and operation and/or licensing of a fully enclosed mobile heat exchange bundle cleaning system (the Fast Clean System), used in hydroblast cleaning of equipment used in the oil and gas industry. Limited partnership interests in Partnership were acquired pursuant to a private offering memorandum dated December 8, 1983 (the 1983 memorandum). The limited partners in Partnership were as follows: Name
Ownership Interest
Richard W. Krajicek (Richard Krajicek)
29.7 %
Edward Randall, III (Mr. Randall)
39.6  Max Miller
4.95  Michael Miller
4.95  Martha Calvin
4.95  Michael Krajicek
4.95  Stephen Krajicek
4.95  Charles Stanley
4.95  From at least December 1983 through at least June 1986, Richard Krajicek, the co-inventor of the Fast Clean System, was also president, chairman of the board of directors, and a share-holder holding 34 to 40.5 percent of the stock [5] of Serv-Tech. Mr. Randall was an investment banker who had known Richard Krajicek for over 20 years and been involved with him regarding Cesco, a company engaged in the chemical plant cleaning business. As of May 12, 1986, Mr. *229 Randall, Max Miller, Michael Miller, and Charles Stanley each owned less than 2 percent of the Serv-Tech stock. On December 29, 1983, Partnership executed a research and development agreement (the form of which was attached as an exhibit to the 1983 memorandum) with Mac-Tech, Inc. (Mach-Tech), a wholly owned subsidiary of Serv-Tech. The research and development agreement provided that Mach-Tech, through its own activities and subcontracts, would use its best efforts to develop the technology and equipment for the Fast Clean System and assist in obtaining patents therefor for a fixed fee of $ 347,500, payable $ 250,000 on or before December 31, 1983, and $ 97,500 during 1984. The research and development agreement terminated on the earliest of (1) reduction of the Fast Clean System to commercial use, (2) expenditure of the $ 347,500, or (3) December 31, 1985. Partnership *230 paid Mach-Tech $ 250,000 on December 31, 1983, and $ 118,713 in 1985. [6]
Also on December 29, 1983, Partnership executed a grant of option to acquire exclusive license (license option agreement) with Serv-Tech, which granted Serv-Tech a right of first refusal to acquire a nonexclusive license and an exclusive license. Under this agreement, the form of which was also attached to the 1983 memorandum, Partnership could not "sell, alienate, assign or otherwise transfer any right, title, interest or license" to the Fast Clean System without offering *231 Serv-Tech the option under the two license provisions. The nonexclusive license option provided Serv-Tech with the right to manufacture and use the Fast Clean System in Serv-Tech's service operations for the 18-month period after the Fast Clean System was reduced to commercial practice. [7] If Serv-Tech exercised this option, Serv-Tech was required to "purchase" the Fast Clean System from Partnership for the greater of (1) the cost of reproduction reduced by depreciation, if any, or (2) the fair market value. At the end of the 18-month license term, if Serv-Tech did not exercise the exclusive license option described below, Partnership was required to repurchase the Fast Clean System for the greater of (1) the price paid by Serv-Tech, reduced by depreciation for tax purposes, or (2) fair market value. *232 The exclusive license option granted Serv-Tech the right to acquire an exclusive license "to manufacture, use, market and otherwise commercially exploit" the Fast Clean System for the period subsequent to the 18-month period. Except in the event of failure by Serv-Tech to pay royalties or make reasonable marketing efforts, this exclusive license would continue until the expiration, including extensions, reissues, or renewals, of any United States or foreign patents of the Fast Clean System or improvements thereon. If Serv-Tech exercised either option, Serv-Tech agreed to pay Partnership a royalty of 12.5 percent for 1984 and 1985, and 2 percent thereafter, of gross revenues from (1) sales and rentals of machines utilizing the Fast Clean System, (2) sublicensing of the Fast Clean System, and (3) services using the Fast Clean System. The unsigned certificate and agreement of limited partnership of Partnership (the partnership agreement) attached to the 1983 memorandum includes an option, exercisable in 1985 through 1987, for Serv-Tech to exchange its stock for all of the interests of the limited partners, provided that for the 90 days preceding the notice to exercise the option *233 the Serv-Tech stock was listed on the New York or American Stock Exchange or quoted on the NASDAQ System. The "Summary of the Business" section of the 1983 memorandum states in part: "The Partnership also will seek to secure patent protection for * * * [the Fast Clean System], and will grant to * * * [Serv-Tech], the General Partner, an option to acquire an exclusive license to commercially exploit * * * [the Fast Clean System]." The "FEDERAL INCOME TAX ASPECTS" section of the 1983 memorandum states in part: "* * * [Serv-Tech] will acquire * * * [the Fast Clean System], once developed, instead of the Partnership retaining it for use in its own trade or business". All of the "Financial Illustrations" in the 1983 memorandum assume that Partnership revenues from the Fast Clean System are 12.5-percent royalties for 1984 and 1985 and 2-percent royalties thereafter. On February 15, 1985, Mach-Tech, acting as research and development contractor to Partnership, and Serv-Tech executed a testing agreement, pursuant to which Serv-Tech agreed to test the Fast Clean System in commercial jobs at its expense and was entitled to all revenues. The testing agreement did not provide for the sale *234 of the Fast Clean System by Serv-Tech. The testing agreement terminated when the Fast Clean System was reduced to "optimum expected commercial use", but no later than December 31, 1985. During 1985, Serv-Tech sold four units of the Fast Clean System to (1) Fast Clean, Inc., from which it leased them back for a rental "incurred" of about $ 30,000 for 1985, and (2) Nolo Bido, Inc., from which it received $ 48,883 for managing and operating the related equipment for 1985. In a report for the calendar year 1985, Serv-Tech stated that five units of the Fast Clean System were in service during 1985 generating gross revenue of $ 985,105. Additionally, the notes to the consolidated financial statements for Serv-Tech and its subsidiaries for 1985 and 1986 state that the sales of the four units of the Fast Clean System "resulted in revenues of approximately $ 1,100,000 and manufacturing costs of approximately $ 834,000." No part of the proceeds from the sale of the Fast Clean System units nor royalties on the revenues generated from operation of it by Serv-Tech were paid to Partnership. On September 9, 1985, an application for a United States patent for the Fast Clean System was filed, *235 [8] and the patent was subsequently issued. On November 11, 1985, an application for a European patent for the Fast Clean System was filed on behalf of Partnership, and that patent was also subsequently issued. The Fast Clean System was ready for commercial exploitation on January 1, 1986. On January 2, 1986, pursuant to the license option agreement, Serv-Tech executed a temporary nonexclusive license agreement with Partnership for the Fast Clean System for a period of 18 months, and Serv-Tech agreed to purchase the Fast Clean System equipment owned by Partnership for $ 121,208, payable with a note. A document entitled "ASSIGNMENT" dated February 21, 1986, provides *236 that Richard Krajicek and Robert R. Cradeur, as the joint inventors, assign Partnership all rights, title, and interest in the Fast-Clean System and any related U.S. and foreign Letters Patent granted. In May 1986, a confidential offering memorandum (the 1986 memorandum) pursuant to which Serv-Tech offered to exchange shares of its common stock for the interests of all of the limited partners in Partnership, was circulated to the partners of Partnership. [9] The 1986 memorandum stated in part: Reason for Exchange Offer. * * * [Partnership] was established to research, develop and test the Fast Clean system as to its feasibility and applicability in refinery, petrochemical and industrial applications. The general research objectives of * * * [Partnership] have been met. * * * [Mach-Tech], the research and development contractor, completed the research and development program at the end of December, 1985. In order to commercially exploit the developments made through the research and development program, it will be necessary to build additional Fast Clean systems, to expand marketing program [sic] and to coordinate the Fast Clean system with other petrochemical plant maintenance *237 activities. * * * [Partnership] does not presently have the financial resources or the skilled personnel necessary to undertake such a program. * * * [Serv-Tech] feels that combined with * * * [Serv-Tech's] other product lines, the acquisition of * * * [Partnership] Interests will give * * * [Serv-Tech] the technology necessary to provide the petrochemical industry a totally integrated on-site heat exchanger maintenance capability. * * * [Serv-Tech's] presence in the market will provide the basis for introducing the Fast Clean system to its established customers. * * * [Serv-Tech] feels that it is positioned to undertake commercial exploitation of the Fast Clean system. It is unlikely that * * * [Partnership] could economically provide for its own account, the experienced personnel, facilities and other resources which will be necessary to market and continue development of the Fast Clean system. [Emphasis added.]
*238 Pursuant to the 1986 memorandum, the exchange would only be consummated if all partners accepted. The number of shares to be exchanged was determined by the board of directors of Serv-Tech. [10] The 1986 memorandum stated further: Control. Assuming all of the Serv-Tech stock offered hereby is acquired pursuant to the terms of this Offering, the present shareholders of * * * [Serv-Tech] will own 92.3% of the shares of the Serv-Tech stock. Since * * * [Serv-Tech's] Articles of Incorporation do not provide for cumulative voting, such ownership and their positions with * * * [Serv-Tech] will enable such shareholders to continue to control * * * [Serv-Tech's] policies and affairs. * * *
Additionally, the 1986 memorandum provided that, "Concurrent with the offer to exchange" the stock, Serv-Tech requested that the limited partners of Partnership consent to the 1985 sales of the Fast Clean System, which it *239 stated were sold to affiliates of Partnership at cost. All of the limited partners in Partnership accepted the offer. In June 1986, the limited partners of Partnership received a total of 475,000 shares of Serv-Tech common stock in exchange for their partnership interests. Thereafter, Serv-Tech used the Fast Clean System in its business. For the fiscal year ended December 31, 1992, Serv-Tech reported gross revenues of about $ 148 million and had net income of about $ 6 million. Regarding the 1986 exchange, the notes to the consolidated financial statements for Serv-Tech and its subsidiaries for the fiscal year 1985 state that, because of the exchange, Serv-Tech was "relieved of obligation to reimburse * * * [Partnership] for the research and development advances of $ 250,000" and that that amount would be recorded as income for the fiscal year 1986. During the tax years 1983 through 1986, Partnership had no employees, no activities other than those described herein, and no office other than that of its general partner, Serv-Tech. On the Form 1065, U.S. Partnership Return of Income for the short taxable year December 30 through December 31, 1983, Partnership elected to use the *240 cash method of accounting and the current expense method for reporting "research and experimental expenses" under section 174(a), and deducted $ 250,000 for research and development expenses. An amended return was filed for that year to reflect a tax preference item of $ 247,917 for research and development expenses. On the return for Partnership for 1985, research and development expenses deducted total $ 118,713, and the tax preference item for research and development expenses is $ 106,842. In Notices of Final Partnership Administrative Adjustment (FPAAs) for Partnership, respondent disallowed the "Research & Development" deduction claimed, and eliminated the tax preference item reported, for research and development expenses for each of the years 1983 and 1985, respectively. OPINION Section 174 allows a taxpayer to treat as deductible research and experimental expenditures paid during the taxable year "in connection with" the taxpayer's trade or business. [11] Treasury regulations provide that the expenditures may be paid for research or experimentation carried on by the taxpayer or another on the taxpayer's behalf. Sec. 1.174-2(a)(2), Income Tax Regs. The issue in this *241 case is whether Partnership engaged in the requisite trade or business to which the expenditures in question relate.
Petitioner contends first that Partnership engaged in a trade or business by virtue of the operation of the Fast Clean System by Serv-Tech after the "merger" of Partnership with it. Second, petitioner argues that Partnership engaged in a trade or business based on the marketing activities during 1985 and 1986 of Richard Krajicek, who was allegedly acting as a limited partner of Partnership and officer of Serv-Tech, the general partner of Partnership. Third, petitioner maintains that there was a "realistic prospect" Partnership would have engaged in a trade or business if the "merger" had not taken place because Richard Krajicek and Mr. Randall, the two limited partners with the greatest ownership interests, had the ability to do so given their *242 respective backgrounds as inventor and investment banker. Respondent contends that Partnership had no realistic prospect of engaging in a trade or business relating to the Fast Clean System but could at most act as a passive investor because of the existence of the exclusive license option. Additionally, respondent argues that activities of Serv-Tech after June 1986 should not be attributed to Partnership because the limited partners' interests in Partnership were much greater than their stockholdings in Serv-Tech after the 1986 exchange. Respondent also maintains that petitioner has not shown that Richard Krajicek was acting on behalf of Partnership in 1985 and 1986. We agree with respondent. In order to be entitled to deductions for research and development expenditures, a taxpayer need not be engaged in a trade or business currently. Snow v. Commissioner, 416 U.S. 500, 503-504 (1974). However: For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are *243 sufficiently substantial and regular to constitute a trade or business * * * [Green v. Commissioner, 83 T.C. 667, 686-687 (1984).]
The applicable test is whether the taxpayer has a "realistic prospect" of engaging in a trade or business. Harris v. Commissioner, 16 F.3d 75, 81 (5th Cir. 1994), affg. T.C. Memo. 1990-80, supplemented by 99 T.C. 121 (1992); Diamond v. Commissioner, 92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991); Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403. The factors considered are (1) the terms of the parties' contractual arrangements, (2) the intentions of the parties to the agreements, (3) business activities, if any, of the partnership, (4) exercise of control by the partnership over the entity doing the research, and (5) the capacity and incentive, if any, of the partnership to use the product in its own trade or business. See Kantor v. Commissioner, 998 F.2d 1514 (9th Cir. 1993), *244 affg. this issue T.C. Memo. 1990-380; Double Bar Chain Co. v. Commissioner, T.C. Memo. 1991-572. The grant of an exclusive license to exploit technology before beginning research and development has been held to preclude a licensor from engaging in a trade or business with respect to the technology. Spellman v. Commissioner, supra; Green v. Commissioner, supra.
We concluded similarly as to an option to acquire an exclusive license to exploit the product granted before the beginning of the research and development work and sale of limited partnership interests in Diamond v. Commissioner, surpa. In Diamond v. Commissioner, supra, the taxpayer contended that there was merely an option to acquire an exclusive license, and, if the option was not exercised, the partnership could exploit the products resulting from the research. We concluded that there was no realistic prospect that the partnership could do so. [12]Diamond v. Commissioner, supra at 439. In so concluding, we adopted *245 the rationale of the Court of Appeals for the Seventh Circuit in Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), that, if the option price is reasonable and sufficient profits are anticipated to justify incurring the manufacturing and marketing costs, the corporation would exercise the option in its sound business judgment. Diamond v. Commissioner, supra at 440. *246 Pursuant to the right of first refusal [13] in the license option agreement here, Partnership could not sell, alienate, assign, or otherwise transfer any right, title, interest, or license to the Fast Clean System, without offering Serv-Tech the option to an exclusive license to manufacture, use, market, and otherwise commercially exploit the Fast Clean System. The exclusive license option lasted for the life of the patents. In return, Partnership would receive royalties. *247 During the years 1983 through 1986, Partnership had no employees. See Harris v. Commissioner, supra at 80 n.10. By contrast, Serv-Tech had established itself in the relevant field and had products related and complementary to the Fast Clean System. There was marketing activity and some income in 1985 relating to the Fast Clean System. Petitioner has not presented evidence that there was no income earned during the first half of 1986, when royalties would be payable to Partnership under the January 2, 1986, temporary, nonexclusive license agreement, or that royalties were paid. The record does not contain statements from Serv-Tech to Partnership setting forth why royalties were not payable or Serv-Tech's activities on behalf of Partnership during the first half of 1986. [14]
*248 The 1983 memorandum states that: "[Serv-Tech] will acquire * * * [the Fast Clean System], once developed, instead of the Partnership retaining it for use in its own trade or business". See Double Bar Chain Co. v. Commissioner, T.C. Memo. 1991-572, in which we considered statements in the private offering memorandum in concluding that the partnership there never intended to engage in a trade or business. The 1986 memorandum states that "It is unlikely that * * * [Partnership] could economically provide for its own account, the experienced personnel, facilities and other resources which will be necessary to market and continue development of the Fast Clean System." Again, this statement in the 1986 memorandum supports our conclusions regarding the prospects in 1983 and 1985 of Partnership engaging in a trade or business relating to the Fast Clean System. See Levin v. Commissioner, supra at 406 n.3. We have considered that Richard Krajicek, who was the co-inventor, was a limited partner in Partnership with a 29.7 percent ownership interest. However, he was also the largest single shareholder, president, and chairman *249 of the board of directors of Serv-Tech. We are unable to conclude that, as a limited partner, he was acting on behalf of Partnership. Recently in concluding that a limited partner was not entitled to deduct research and development expenditures by a partnership which granted an option for a perpetual license of the resulting technology to the corporation doing the research, the Court of Appeals for the Fifth Circuit noted that: In analyzing the operational nexus facet of section 174, the courts have dealt with a broad spectrum of financial arrangements. At one end of the spectrum lie arrangements in which a partnership buys stock in a corporation, which then uses the capital to fund research activities, manages the research activities itself, manufactures the resulting product, sells the product in the marketplace, and returns a portion of the profits to the partnership as dividends. In these situations, the partnership does not incur research expenses in connection with its trade or business but, instead, functions as an investment vehicle that cannot deduct the cash paid to the corporation under section 174 even if the corporation used that very cash to fund its research *250 expenditures. At the other end of the spectrum lie financial arrangements in which a partnership uses its own funds to conduct research activities, manufactures the product itself, and sells that product in the marketplace. In this instance, the partnership incurs research and development expenditures in connection with its trade or business and can deduct them under section 174. * * * [Harris v. Commissioner, 16 F.3d 75, 78 (5th Cir. 1994).]
The facts here place Partnership on the "spectrum" as a passive investor used as a financing vehicle, without an established realistic prospect of engaging in a trade or business relating to the Fast Clean System. The expectations were that Serv-Tech would do so, or if Serv-Tech could not do so, an entity other than Partnership would do so. See United Fibertech, Ltd. v. Commissioner, T.C. Memo. 1991-445, affd. 976 F.2d 445 (8th Cir. 1992), in which we concluded that, even after the licensee, a research and development corporation, could not market the product because of financial problems, the partnership searched for a successor, and did not try *251 to acquire a staff or "entertain the idea of manufacturing or marketing the product" itself. Relying on Snow v. Commissioner, 416 U.S. 500 (1974), petitioner contends that the activities of Serv-Tech after the exchange of its stock for the limited partners' interests in Partnership should be attributed to Partnership. In Harris v. Commissioner, 16 F.3d at 78, the Court of Appeals for the Fifth Circuit stated that: Snow settled that the temporal nexus of a research project to the start of an active trade or business was not dispositive of section 174's applicability, it left open the degree of "connection" required between the expenditures and the operation of the trade or business itself -- the operational nexus * * *
Petitioner has not established "the operational nexus" for Partnership here nor persuaded us that the facts here are sufficiently analogous to Snow. Petitioner argues further that (1) Partnership could only act through its partners, and (2) Richard Krajicek, as a limited partner and an officer of Serv-Tech, the general partner, of Partnership, was doing significant marketing from 1983 through *252 1986, which should be attributed to Partnership. Petitioner also maintains that advertising brochures of Serv-Tech for services relating to the Fast Clean System should be attributed to Partnership because Serv-Tech was acting on Partnership's behalf. [15] Richard Krajicek testified as follows regarding his activities: Q When you were marketing Fast Clean, who were you marketing on behalf of? Let's take first in 1985. A Oh, I guess I was probably marketing on behalf of myself, you know, being I had -- but I would say I was marketing it on behalf of Mach-Tech and the general partners [sic], the people who put up the money.
*253 Both Richard Krajicek and Serv-Tech had many roles in the entities and transactions relating to the Fast Clean System. Petitioner has not persuaded us that either was clearly acting for Partnership in engaging in the marketing activities in 1985. The facts described above indicate that all intended for Serv-Tech to engage in the trade or business as to the Fast Clean System. The party on whose behalf the marketing activities were undertaken was left at best vague [16] so that Serv-Tech could do so. Because the activities of Serv-Tech and Partnership were so intertwined, we cannot conclude that Serv-Tech was acting in its capacity as general partner rather than on its own behalf. *254 Petitioner also maintains that Partnership had the realistic prospect of engaging in a trade or business relating to the Fast Clean System because, based on their respective experience, Richard Krajicek and Mr. Randall could have marketed the Fast Clean System if the limited partners had not agreed to the "merger" with Serv-Tech. In the reply brief, petitioner argues that Serv-Tech was "near bankruptcy", could not "cram [the exclusive license option] down . . . on" the limited partners, and never intended to exercise it. Additionally in the reply brief, petitioner contends that Mr. Randall would have stopped the exercise of the exclusive license option by Serv-Tech and marketed the Fast Clean System elsewhere. We rejected a similar argument in Diamond v. Commissioner, 92 T.C. 423, 441 (1989), affd. 930 F.2d 372 (4th Cir. 1991), stating as follows: Robotics' general partners had an abundance of relevant experience, which they could presumably employ to assemble a staff. However, the Seventh Circuit found in Spellman that the lack of such resources was not the factor that was fatal to the taxpayer's case, but that *255 "whatever Sci-Med's desires," it would have the opportunity to engage in a trade or business with respect to the byproducts only if it was uneconomical to do so [and the option was not exercised]. Taxpayer there, as petitioner here, is prevented from engaging in the particular trade or business either by the law of contracts or the laws of economics.
Petitioner has not demonstrated that Serv-Tech would not exercise the option under its right of first refusal, how it could be stopped from doing so, or why the option existed if Serv-Tech did not intend to exercise it. Petitioner has not sufficiently shown that Serv-Tech was "near bankruptcy" (the limited partners who exchanged their interests in Partnership for Serv-Tech stock apparently did not think so), or that there was a realistic prospect that Partnership would engage in a trade or business even if Serv-Tech did not exercise the option or otherwise acquire rights to the Fast Clean System. Petitioner relies on testimony of Mr. Randall in response to a hypothetical question assuming that the limited partners rejected the exchange of Serv-Tech stock for their partnership interests as follows: Q * * * My question to you *256 is, sir, at that time if Serv-Tech had come back to you and said, Well, we are now going to exercise our permanent royalty, and take the technology from you, what would have been your reaction? * * * THE WITNESS: I would have seriously objected and sought remedies to stop that. * * * Q And why is that, sir? A Well, if I had said no to the Serv-Tech offer, after it was improved, it would have been because I lacked confidence in the future of the company. And I would have wanted to take the product that we had developed and market it elsewhere. And marketing such a thing like that is something that I was familiar with.
However, on cross-examination, Mr. Randall testified that this reference to marketing the Fast Clean System assumed that Mr. Krajicek would also be involved in that effort and was, at best, vague as to whether he would have gone forward without Mr. Krajicek. This testimony does not persuade us that Mr. Randall could have stopped Serv-Tech from exercising the option or had a realistic plan for Partnership to engage in a trade or business, rather than to license the Fast Clean System for royalties. Although petitioner implies in the reply brief that testimony *257 of the vice president, chief financial officer, and a director of Serv-Tech as of January 1986 was to the effect that Serv-Tech would never exercise the exclusive license option, the testimony does not say this clearly and is insufficient to establish this point. In the reply brief, petitioner repeatedly characterizes respondent's contentions as based not on the substance of the transactions but on "magic words", referring to the term used in describing the taxpayers' arguments in Levin v. Commissioner, 832 F.2d 403, 406 (7th Cir. 1987), affg. 87 T.C. 698 (1986), to the effect that: "if the partnership's documents contain the right language, then all is well." Unfortunately, this characterization does not do the trick, because neither the form (the documents) nor the substance of the transaction supports petitioner's position. To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. The term "tax matters partner" is defined in sec. 6231(a)(7)↩.
3. Serv-Tech, Inc. (Serv-Tech), was originally named Mac-Services, Inc., but its name was changed in 1984. For simplicity, all references herein are to Serv-Tech.↩
4. Unless stipulated to the contrary, venue for appeal in petitions filed under the TEFRA unified partnership provisions is the U.S. Court of Appeals for the circuit in which the principal place of business of the partnership is located at the time the petition is filed. Sec. 7482(b)(1)(E); see Peat Oil & Gas Associates v. Commissioner, T.C. Memo. 1993-130↩, in which one of the factors we considered in deciding appropriate venue for appeal was the principal place of business of the tax matters partner.
5. From Jan. 1, 1983, through June 30, 1986, no other single shareholder owned more Serv-Tech stock than Richard W. Krajicek (Richard Krajicek).↩
6. The parties stipulated that: "The Partnership has substantiated, all of its expenditures". There is no explicit explanation in the record for why the second amount was not paid in 1984, or was greater than the $ 97,500 provided in the research and development agreement. However, the research and development agreement states that Mach-Tech, Ltd. Partnership (Partnership) shall pay or reimburse Mach-Tech, Inc. (Mach-Tech), for certain costs relating to obtaining patents.↩
7. The license option agreement defines the term "reduction to commercial practice" as the design and manufacture of a fully enclosed mobile bundle cleaning system and a successful bundle cleaning operation under normal commercial conditions, evidenced by a letter or other written instrument indicating satisfactory operation by the responsible manager of the industrial facility where such bundles were cleaned.↩
8. The patent document in the record describes the product as a "Mobile Articulatable Tube Bundle Cleaner", and reflects Serv-Tech as the assignee from the inventors, Richard Krajicek and Robert R. Cradeur. A confidential offering memorandum circulated in May 1986 (described infra↩) states that Mach-Tech applied for patents on behalf of Partnership.
9. The condition to the exercise of the option to exchange contained in the partnership agreement (that Serv-Tech stock be listed or quoted on one of the enumerated stock exchanges) was not met at that time.↩
10. The parties stipulated that the adequacy of the consideration in the exchange is not disputed.↩
11. The "taxpayer" for this purpose is the partnership. Cf. Campbell v. United States, 813 F.2d 694, 695-696↩ (5th Cir. 1987).
12. Diamond v. Commissioner, 92 T.C. 423 (1989), affd. 930 F.2d 372 (4th Cir. 1991), has been repeatedly followed in other situations involving grants of options to acquire exclusive licenses in exchange for royalties, see, e.g., Harris v. Commissioner, 16 F.3d 75, 81 (5th Cir. 1994), affg. T.C. Memo. 1990-80, supplemented by 99 T.C. 121 (1992); Kantor v. Commissioner, 998 F.2d 1514 (9th Cir. 1993), affg. this issue T.C. Memo. 1990-380. We have also disallowed deductions claimed for research and development expenditures in situations where the licenses were not executed in writing contemporaneously with the research and development agreements. See Stauber v. Commissioner, T.C. Memo. 1992-128 (facts indicated that a "pre-existing understanding" concerning a future license existed); Double Bar Chain Co. v. Commissioner, T.C. Memo. 1991-572↩ (there existed an "understanding" regarding a future license of technology).
13. Petitioner does not contend that the right of first refusal (i.e., that Partnership has to "sell, alienate, assign or otherwise transfer any right, title, interest or license" to the Fast Clean System before the licensee can exercise the option) distinguishes this case from Diamond v. Commissioner, supra. Petitioner did not cite us to any case involving a right of first refusal in this context. The only case found is Universal Research & Development Partnership No. 1 v. Commissioner, T.C. Memo. 1991-437, in which the deduction for research and development expenses was allowed. In Universal Research↩, respondent had the burden of persuasion, and the licensee had no more experience relating to the product resulting from the research than the partnership. Here, petitioner bears the burden, and the licensee, the general partner of Partnership, had extensive experience in the industry.
14. We consider these facts in deciding whether subsequent events are consistent with our conclusions regarding the prospects in 1983 and 1985 of Partnership's engaging in a trade or business relating to the Fast Clean System. See Levin v. Commissioner, 832 F.2d 403, 406 n.3 (7th Cir. 1987), affg. 87 T.C. 698↩ (1986).
15. The testing agreement provisions suggest that Serv-Tech was acting for its own benefit in 1985 and had total control over Partnership. Despite earning revenues from the use of the Fast Clean System, Serv-Tech was not required to make any payment, and apparently not even required to provide an accounting, to Partnership. The testing agreement did not provide for sales of units of the Fast Clean System. Consent to the sales of the units by Serv-Tech in 1985 was not sought or obtained until 1986, nor was an accounting of prices and associated expenses provided.↩
16. Petitioner presented testimony that "typical" marketing efforts for limited partnerships owning real estate and video rental franchises, respectively, are made under the name of entities other than the partnerships. Petitioner relies on the testimony in support of its arguments. We do not find the testimony or these arguments persuasive. The businesses are totally different from that of Partnership, section 174↩ does not appear to apply, and there is no indication that the courts have concluded the other partnerships engage in a trade or business for tax purposes.